**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

—————————————————————

THE REPUBLIC OF ARGENTINA
Posados 1641,
Buenos Aires, C.P. 1112,
Republic of Argentina

              Petitioner,

    -against-


AWG GROUP LTD.
Lancaster House Lancaster Way,
Ermine Business Park,
Huntingdon,
Cambridgeshire, PE29 6YJ

              Respondent.

—————————————————————

Case No.



**PETITION TO VACATE**
**ARBITRATION AWARD**

Petitioner the Republic of Argentina ("Argentina"), by its attorneys, Cleary Gottlieb Steen & Hamilton LLP, respectfully submits this petition to vacate an arbitral award rendered against it and in favor of respondent AWG Group Ltd. ("AWG").

**PRELIMINARY STATEMENT**

1.      The arbitral award at issue arose from an arbitration (the "Arbitration") brought under the bilateral investment treaty between the United Kingdom and Argentina. Agreement Between The Government of the United Kingdom of Great Britain and Northern Ireland and The Government of the Argentine Republic for the Promotion and Protection of Investments, UK-Arg., Dec. 11, 1990, 1765 U.N.T.S. 34 (the "Argentina-UK BIT" or the "BIT"). AWG, a national of the United Kingdom, claimed that its rights under the BIT in respect of an investment in a public utility concession in Argentina were breached by measures taken by the government

of Argentina to address the worst economic, political, institutional, financial, and social crisis in the country's history. The arbitral tribunal agreed and awarded AWG approximately $20 million.

2.      However, during the course of the proceedings, one of the arbitrators accepted an appointment to the Board of Directors of UBS, a major financial institution that was also a major investor in claimants in the arbitration, as well as in various claimants in other arbitrations against Argentina. Although she submitted to UBS a list of all of her pending arbitrations at the time of her nomination to the board, she failed to disclose her board appointment to the parties in the arbitration and failed to investigate UBS' relationship to the claimants. When Argentina learned of the appointment, it sought to remove the arbitrator because her interest in the outcome of the case created reasonable doubt as to her ability to be impartial and independent of the parties, as required by the arbitral rules and U.S. law. The arbitrator refused to step down, a decision accepted by her co-arbitrators, and she went on to provide the decisive vote in finding Argentina liable. Because of the "evident partiality" of the arbitrator, within the meaning of the Federal Arbitration Act, 9 U.S.C. § 10(a)(2), the award should be annulled.

3.      In addition, the tribunal exceeded its powers by awarding damages for conduct that, under its own decision on liability, did not violate the BIT. The tribunal also failed to apply the international law standard for the defense of necessity, as required by the BIT, which likewise constitutes an excess of power. In these respects, the award constitutes the arbitrators' own sense of justice, and not the application of the law agreed upon by the parties, and therefore warrants annulment under 9 U.S.C. § 10(a)(4).

## THE PARTIES

4.      Petitioner is the Republic of Argentina ("Argentina"), acting through the Procuración del Tesoro de la Nación (Office of the Attorney General) whose principal office is located at Posados 1641, Buenos Aires, C.P. 1112, Republic of Argentina.

5.      Respondent AWG Group Ltd. ("AWG") is a British corporation located at Lancaster House Lancaster Way, Ermine Business Park, Huntingdon, Cambridgeshire, PE29 6YJ.

6.      Petitioner seeks to vacate the final award, dated April 9, 2015 (the "Award," Declaration of Matthew D. Slater, July 6, 2015 ("Slater Decl."), Ex. A), in favor of AWG and against Argentina, inclusive of the decision on jurisdiction, dated August 3, 2006 (the "Jurisdiction Decision," Slater Decl., Ex. B), and the decision on liability, dated July 30, 2010 (the "Liability Decision," Slater Decl., Ex. C).

## JURISDICTION

7.      This Court has jurisdiction over each of the parties and the subject matter of this petition pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201 *et seq*., because these foreign parties agreed that Washington, D.C. would be the seat of the arbitration, and the Award was made in Washington, D.C.

8.      Under 9 U.S.C. § 207, this court has jurisdiction to vacate the Award pursuant to 9 U.S.C. § 10(a), which states in pertinent part:

> In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
>
> [. . .]
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;

3

[. . .]

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.[1]

## FACTUAL BACKGROUND

9.      The facts underlying the Award stem from Argentina's severe economic, political, institutional, financial, and social crisis of 2001, as summarized below.

## I.      PRIVATIZATION AND CONCESSION

10.      During the 1980s, the Argentine economy, including the country's public enterprises, suffered severe problems.  The country experienced steep currency devaluation, extremely high inflation, and severe public deficits.  In 1989, in response to this economic crisis, Argentina enacted the State Reform Law,[2] which declared the country's public services to be in a state of emergency and enacted a program of privatization.  The Argentine government planned to transfer operations and functions of certain State-owned companies to private investors in accordance with specified legal arrangements.  Slater Decl., Ex. C ¶¶ 28-29.

11.      As part of Argentina's reform and privatization process, it enacted Decree No. 2074/90 of October 5, 1990 to establish a regulatory framework to privatize certain public services.  This framework provided for the grant of long-term concession agreements whereby the private concessionaire would be obligated to provide the service and new capital and technology.  In return, the concessionaire would be entitled to the payment of tariffs.  Slater Decl., Ex. C ¶¶ 30-32.

---

[1]      This is without prejudice to other grounds for annulment that may apply to either the *AWG* award or the parallel awards issued by the tribunal in favor of other claimants, that arise under other applicable laws and jurisdictions, such as Article 52 of the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, Mar. 18, 1965, 575 U.N.T.S. 159.

[2]      Law No. 23,696 of 23 August 1989.

12.     On June 30, 1992, Argentina enacted the "Water Decree"[3] to establish such a regulatory framework specifically to privatize the provision of water and sewage services to the city of Buenos Aires and certain surrounding municipalities.  Argentina engaged in a bidding process to call for bidders who would be willing to provide public services.  The winning bidder was to be the bidder that promised to charge the lowest average tariff while making the specified investments and meeting certain quality and efficiency standards.  The concessionaire's cash flow, including operating costs and profit, was to be wholly comprised of tariffs paid by the end users.  Slater Decl., Ex. C ¶¶ 30, 32.

13.     AWG, together with three other foreign companies, Suez, Vivendi Universal, S.A. ("Vivendi"), and Sociedad General de Aguas de Barcelona S.A. ("AGBAR"), and three Argentine companies, Banco de Galicia y Buenos Aires S.A., Sociedad Comercial del Plata S.A., and Meller S.A., formed a consortium to bid for the concession.  On December 28, 1992, Argentina, by Resolution No. 155/92 of the Secretariat of Public Works and Communications, later approved by Decree No. 787/93 of 20 September 1993, awarded the concession to the consortium involving AWG.  Pursuant to the legal and regulatory framework governing the privatization process, the consortium founded an Argentine company called Aguas Argentinas S.A. ("AASA") to enter into the concession.  AWG initially had a 4.5% interest in AASA. Slater Decl., Ex. C ¶¶ 32-33.

14.     On April 28, 1993, AASA concluded a thirty-year concession contract with Argentina to provide water and sewage services to Buenos Aires and surrounding municipalities ("Concession Contract").  The Concession Contract outlined the tariff regime under which AASA would operate, and further specified that AASA did not own the assets of the water and

---

[3]        Decree No. 999/92, of 30 June 1992.

sewage service it was to manage and develop or its investments in them.  At the conclusion of the concession, AASA was to return the service and related assets to Argentina.  Slater Decl., Ex. C ¶ 34.

15.     The Concession Contract required upfront investment to improve and expand the system.  AASA therefore required funding.  AASA sought most of its loans from multilateral lending agencies, from which it was able to receive more favorable interest rates compared to other forms of available financing.  However, AASA's borrowings created risk for the consortium.  First, these loans were payable in U.S. dollars, whereas AASA would receive tariff payments in Argentine pesos.  Second, as a condition of the loans, AASA shareholders (including AWG) were required to provide guarantees.  Slater Decl., Ex. C ¶ 35.

16.     The Concession Contract contained a termination clause allowing termination under specified circumstances, including termination for the concessionaire's fault.  Slater Decl., Ex. C ¶ 114.

## II.      THE ECONOMIC AND SOCIAL CRISIS

17.     During the 1990s, Argentina was seen as a model of successful policymaking.  In March 1991, Argentina adopted the Convertibility Law,[4] which pegged the value of the Argentine peso to the U.S. dollar and established a currency board requiring that the amount of Argentine currency in circulation be equivalent to the foreign currency reserves held by the State.  Slater Decl., Ex. C ¶ 29.  By pegging its exchange rate to the U.S. dollar, Argentina ended hyperinflation and reduced inflation rates to single-digit levels.  The World Bank in 1998 rated Argentina second only to Singapore among emerging markets in the quality of its bank

---

[4]      Law No. 23,928 of 28 March 1991.

supervision.[5]  Greater economic stability attracted foreign investment, which contributed to

acceleration in economic growth.[6]

18.      However, a series of external shocks at the turn of the century caused Argentina

to experience an economic, political, institutional, financial, and social crisis that rivaled the

Great Depression.  Although the arbitral tribunal ("Tribunal") accepted that "[e]vidence in the

record . . . clearly shows its severity," Slater Decl., Ex. C ¶ 257, the Tribunal was sparing in its

recitation of the events, which included the following.  After the Asian financial crisis and the

Russian default of 1998, capital stopped flowing to emerging markets like Argentina.  Exports to

Brazil, Argentina's major trading partner, declined, and Argentina became less competitive

internationally as a result of a significant devaluation of Brazil's currency and appreciation of the

U.S. dollar, to which the Argentine peso was pegged.  Argentina's Central Bank lost $11 billion

in reserves and 25% of funds on deposit in banks disappeared in the first quarter of 2001 alone,

and the IMF withheld a loan installment of over $1 billion.  In the collapse that followed,

unemployment peaked at 21.5% in May 2002, and average wages for those who had jobs

decreased by over 70%.[7]  These and several other external shocks that severely affected the

Argentine economy led to sharp declines in export revenues, and Argentina's economic growth

was negative for over three years in a row.  As the Tribunal acknowledged, "The [economic and

social] crisis into which Argentina fell in 2001-2003 was undoubtedly one of the most severe in

its history.  It was characterized by extreme social disturbance, riots, violence, and almost total

breakdown of the political system."  *Id.*; *see also id.* ¶ 43.

---

[5]      Economic Letter, Ramon Moreno, Federal Reserve Bank of San Francisco, Learning from Argentina's Crisis (Oct. 18, 2002), http://www.frbsf.org/economic-research/publications/economic-letter/2002/october/learning-from-argentina-crisis/.

[6]      *Id.*

[7]      The Argentine crisis has been described as the "worst-case scenario" in eight centuries of financial crises. *See* Carmen M. Reinhart & Kenneth S. Rogoff, *This Time is Different: A Panoramic View of Eight Centuries of Financial Crises* 51 (2008).

19.      In facing the worst recession of its history and the political, institutional,

financial, and social crisis that it produced, the Argentine government adopted a series of policies

and measures to return stability to the country.  One of the most important, enacted on January 6,

2002, was the Emergency Law,[8] declaring a state of emergency throughout the country.  The

Emergency Law, among other things:

> 1.   abolished the currency board that linked the Argentine peso to the U.S. dollar, which was followed by a significant depreciation of the Argentine peso;

> 2.   abolished the adjustment of public service contracts according to agreed-upon indexations; and

> 3.   authorized the Executive branch of the government to renegotiate all public service contracts.[9]

Slater Decl., Ex. C ¶ 44.

## III.      TERMINATION OF THE CONCESSION CONTRACT

20.      Starting in March 2002, AASA and Argentina engaged in negotiations to adjust

the terms of the Concession Contract, including tariff revisions, to respond to Argentina's severe

crisis and AASA's increase in costs.  The parties were unable to come to agreement.  During this

time, Argentina alerted AASA to several significant performance failures in violation of the

Concession Contract.  *See* Slater Decl., Ex. C ¶¶ 44-52.

21.      In March 2006, Argentina terminated the Concession Contract for fault by AASA.

In May 2006, a corporate insolvency proceeding with respect to AASA was initiated in an

Argentine court.  AWG, among other AASA shareholders, withdrew from the water and sewage

---

[8]      Law No. 25,561of  6 January 2002.

[9]      Under Article 9 of the Law, the renegotiation of public service contracts was to take account of the following criteria: 1) the impact of tariffs on economic competitiveness and income distribution; 2) the quality of service and investment plans; 3) the interests of the consumers and the accessibility of services; 4) the safety of the system; and 5) the profitability of the enterprises.  Article 10 stated that in no case were the provisions of the Law to authorize a suspension or alteration of the contractual obligations incurred by the affected public services.  Slater Decl., Ex. C ¶ 44.

business in Buenos Aires.  Argentina sustained injuries valued at $2.4 billion as a result of

AASA's failure to fulfill its obligations under the Concession Contract.  Slater Decl., Ex. C

¶¶ 56-57.

## IV.   ARBITRATION

22.     In April 2003, AASA, AGBAR, Suez, Vivendi, and AWG (together the

"Claimants") filed a joint request for arbitration before the International Centre for Settlement of

Investment Disputes ("ICSID"), a body established by the Convention on the Settlement of

Investment Disputes Between States and Nationals of Other States, Mar. 18, 1965, 575 U.N.T.S.

159 ("ICSID Convention" or "Convention").  That Convention provides for arbitration before

ICSID of investment disputes against state parties when both the state of the investor and the

state of the investment have consented to ICSID arbitration.

23.     Suez and Vivendi invoked the 1991 bilateral investment treaty between Argentina

and France, which provides for ICSID arbitration for covered disputes.  Agreement Between The

Government of the French Republic and The Government of the Argentine Republic for the

Promotion and Protection of Investments, Fr.-Arg., July 3, 1991, 1728 U.N.T.S. 2.  Similarly,

AGBAR invoked the 1991 bilateral investment treaty between Argentina and Spain, which

likewise provides for ICSID arbitration for covered disputes once certain conditions are met.

Agreement Between The Argentine Republic and The Kingdom of Spain on the Reciprocal

Promotion and Protection of Investments, Arg.-Spain, Oct. 3, 1991, 1699 U.N.T.S. 202.  Article

8(3) of the Argentina-UK BIT, applicable to AWG's claims, provides that arbitration under the

BIT must be pursued under the UNCITRAL Rules[10] absent an agreement to the contrary and

once certain conditions under Article 8(2) have been fulfilled.  Argentina declined AWG's

---

[10]     The applicable UNCITRAL Rules were established by and may be found at G.A. Res. 31/98, UNCITRAL
Arbitration Rules (Dec. 15, 1976) ("UNCITRAL Rules"), http://www.uncitral.org/pdf/english/texts/arbitration/arb-
rules/arb-rules.pdf.

invitation to arbitrate pursuant to the ICSID Convention, but agreed to allow ICSID to administer the case subject to UNCITRAL Rules alongside the ICSID arbitrations brought by Suez, Vivendi, and AGBAR.  Slater Decl., Ex. C ¶¶ 2-4.  AASA ultimately withdrew from the proceedings.  *Id.* ¶ 14.

24.     The parties agreed that the same Tribunal could hear all of the cases.  Claimants appointed Professor Gabrielle Kaufmann-Kohler as arbitrator, and Argentina appointed Professor Pedro Nikken.  The parties were unable to agree on a third arbitrator, and so, with the agreement of both parties, ICSID appointed Professor Jeswald W. Salacuse as the President of the Tribunal.  Slater Decl., Ex. C ¶¶ 5-7.

25.     Argentina objected to the Tribunal's jurisdiction to hear Claimants' claims because: (1) the dispute did not arise directly out of an investment; (2) the dispute was not a legal dispute under the terms of the ICSID Convention; (3) the Claimants were precluded from bringing an action in arbitration due to the dispute resolution clause in the Concession Contract; (4) once concessionaire AASA had withdrawn from the proceedings, the Tribunal lacked jurisdiction over the shareholder Claimants' claims; and (5) AWG had not complied with Article 8(2) of the BIT, which requires the submission of a treaty dispute to local courts for a period of up to eighteen months before invoking international arbitration.  Slater Decl., Ex. B ¶¶ 27, 33, 41, 46, 52.

26.     On August 3, 2006, the Tribunal issued a decision rejecting these objections and finding that it had jurisdiction to hear the dispute.  Slater Decl., Ex. C ¶ 17.[11]  After extensive briefing, a hearing on liability took place from October 28, 2007 through November 8, 2007 at

---

[11]     Argentina disputes the Tribunal's finding of jurisdiction notwithstanding AWG's noncompliance with the local recourse requirement of Article 8(2) of the Argentina-UK BIT.  As a matter of U.S. law, the Supreme Court has directed the courts to defer to the arbitrators' erroneous ruling.  *See BG Grp. plc v. Arg.*, 134 S. Ct. 1198 (2014).  Argentina does not waive and expressly preserves its defense based on Article 8(2) in any other forum in which enforcement of the Award may be sought.

ICSID in Washington, D.C.  The Claimants argued that Argentina's actions: (1) effected a direct or indirect expropriation of their investments without compensation; (2) failed to accord their investments full protection and security; and (3) failed to accord their investments fair and equitable treatment, in breach of the respective treaty provisions that addressed these subjects. *Id.* ¶ 127.

27.     Argentina argued that none of the measures it took in response to the crisis violated the applicable treaties.  Argentina also raised two affirmative defenses based on international law: (1) that the defense of necessity under international law excused any failure to satisfy its treaty commitments; and (2) that provisions in two of the relevant treaties (including the Argentina-UK BIT) on national emergencies pre-empted the application of other treaty provisions as a result of the Argentine crisis and the measures taken by the government to address them.  Slater Decl., Ex. C ¶ 127.

## IV.     CHALLENGE TO ARBITRATOR PROFESSOR KAUFMANN-KOHLER

28.     On November 22, 2007, after the liability hearing but before the Tribunal issued its decision, Argentina learned that Professor Kaufmann-Kohler had become a non-executive member of the Board of Directors of UBS during the course of the Arbitration, on April 19, 2006.  UBS was a significant shareholder in Suez and Vivendi, two of the Claimants in the Arbitration, and also an active investor in the relevant market.  Professor Kaufmann-Kohler had not previously disclosed her appointment to the parties in the Arbitration.

29.     Argentina promptly submitted a challenge to Professor Kaufmann-Kohler's service as arbitrator – on November 29, 2007 – on grounds that her directorship, and her decision not to disclose it, gave rise to justifiable doubts as to her impartiality and independence, in conflict with the ICSID Convention and the UNCITRAL Rules (the "Challenge").

30.     The two remaining members of the Tribunal suspended proceedings to consider the Challenge.  Both the Claimants and Argentina made multiple submissions, and Professor Charles Wolfram of Cornell Law School, an expert in legal and judicial ethics, submitted two reports in support of the Challenge.  *See* Wolfram Report, Slater Decl., Ex. D; Wolfram Reply Report, Slater Decl., Ex. E.

31.     Professor Wolfram undertook a two-step analysis in determining that Professor Kaufmann-Kohler's UBS directorship resulted in her not meeting the independence and impartiality standards required of arbitrators.  He first considered the interests, if any, of UBS itself with respect to the success of the Claimants in these arbitrations.  He then considered the interests, if any, of Professor Kaufmann-Kohler in furthering such UBS interests.  Slater Decl., Ex. D ¶ 7.  Professor Wolfram concluded that UBS had at least two forms of interest in several of the Claimants: (1) it held stock of certain Claimants on its own account and as wealth-management custodian for its bank clients; and (2) it had publicly recommended to its clients that they invest in the business sector of which Claimants are prominent members or specifically in the stock of certain Claimants.  *Id.* ¶ 8.  With respect to Professor Kaufmann-Kohler's interests, Professor Wolfram then concluded that she had both a "loyalty" interest and an "economic" self-interest.  She could "reasonably be supposed to be motivated to advance [the] interests of UBS because of her membership on the UBS Board," *id.* ¶ 11, and she received a portion of her compensation in UBS stock, *id.* ¶ 15.

32.     Professor Wolfram separately concluded that Professor Kaufmann-Kohler's failure to investigate and disclose, standing on its own, required her disqualification because under long-established custom and practice in arbitration, "[Professor] Kaufmann-Kohler should

have been aware that she was required to make careful inquiry of UBS whether the bank had connections to any party."  Slater Decl., Ex. D ¶ 16.

33.     Professor Kaufmann-Kohler stated that she had no knowledge of the relationship between UBS and certain Claimants prior to the Challenge.  She explained that, upon her nomination to the UBS board, she submitted to UBS a confidential list of her pending arbitrations, and UBS advised that the only potential conflict was her appointment on the jury for the America's Cup race, for which UBS had sponsored a team.  In any event, she concluded that she did not believe that UBS' shareholdings in certain Claimants were sufficient to affect her impartiality or independence as an arbitrator, even once she became aware of them.  Kaufmann-Kohler Letter to Tribunal (Dec. 21, 2007), Slater Decl., Ex. F.

34.     When subsequently asked by the Tribunal why she submitted a list of her pending arbitrations to UBS, she explained that she did so to permit UBS to verify that she met the independence requirements established by Swiss banking law for directors of banks such as UBS.  An incidental reason, only taken "out of an abundance of caution," was to ascertain whether there was a connection between the bank and a party in one of her arbitrations.  When asked why she did not disclose her appointment to the parties when she disclosed their arbitrations to UBS, she reiterated her belief that as a non-executive director, the business relations of the bank did not affect her independence or impartiality as an arbitrator.  Kaufmann-Kohler Letter to Tribunal (Mar. 13, 2008), Slater Decl., Ex. G.

35.     On May 12, 2008, the remaining members of the Tribunal decided Argentina's Challenge, declining to disqualify Professor Kaufmann-Kohler.  In making this decision, they treated the AWG proceeding separately because the AWG case is governed by the UNCITRAL Rules and because UBS was not a shareholder in AWG.  Nonetheless, the Tribunal recognized

that if Professor Kaufmann-Kohler were disqualified in any of the cases, that would likely have an impact on all cases as the Claimants were all partners in the same water privatization at the center of the dispute.  Decision on Disqualification, dated May 12, 2008 (the "Disqualification Decision," Slater Decl., Ex. H).  In the AWG case, the arbitrators determined that the UNCITRAL Rules required a determination of whether "a reasonable, informed person viewing the facts [would] be led to conclude that there is a justifiable doubt as to the challenged arbitrator's independence and impartiality."  *Id.* ¶ 22.  The arbitrators also considered whether Professor Kaufmann-Kohler's failure to disclose her appointment constituted an independent ground giving rise to justifiable doubts as to her impartiality.  *Id.* ¶ 26.

36.     The arbitrators agreed with Professor Kaufmann-Kohler that "as a director of UBS she is not involved in the management of UBS business, does not participate in the development and management of the company's financial products or its research activities, and indeed was unaware of its activities with respect to the water sector."  Slater Decl., Ex. H ¶ 23.  With respect to AWG, they concluded that her directorship role was "too remote and tenuous as to hardly be called a connection or relationship at all."  *Id.* ¶ 24.  With respect to the ICSID cases, they held that UBS' interest in the Claimants was inconsequential.  *Id.* ¶¶ 31-40.  The Tribunal failed to address her fiduciary duty to protect the economic interests of UBS in the Claimants, or her natural inclination to do so, or the justifiable doubts this created regarding her ability to act as an impartial arbitrator under either the UNCITRAL Rules (applicable to AWG) or the ICSID Convention (applicable to the other Claimants).

## V.     LIABILITY DECISION AND AWARD

37.     On July 30, 2010, the Tribunal issued a non-unanimous Decision on Liability.  The Tribunal rejected the Claimants' claims of expropriation and breach of the requirement for

full protection and security, but concluded that Argentina had violated the fair and equitable treatment provisions of the respective investment treaties by certain acts and omissions in the early to mid-2000s with respect to the Concession Contract.  Slater Decl., Ex. C ¶ 247.  The Tribunal specifically held, however, that Argentina's termination of the Concession Contract in 2006 did not violate the treaties and that the Tribunal lacked jurisdiction to decide whether it violated the Concession Contract.  *Id.* ¶¶ 156, 246.  Professor Pedro Nikken issued a separate opinion on liability, dissenting from the majority's grounds for finding that Argentina breached the requirement of fair and equitable treatment, and concluding that Argentina's liability arose at a later date than under the majority's decision.  *See* Nikken Liability Op., Slater Decl., Ex. I; *see also* Slater Decl., Ex. A ¶ 37.

38.     After having found liability, the Tribunal decided to appoint a financial expert, Dr. Akash Deep, to assist the Tribunal by conducting a valuation of any damages.

39.     Pursuant to the Tribunal's terms of appointment, the Tribunal's expert submitted a Preliminary Report, dated December 24, 2012, to the Tribunal.  The Tribunal commented on the Preliminary Report, and returned it to Dr. Deep, without review or comment by the parties.  In response to the Tribunal's comments, Dr. Deep prepared a revised Preliminary Report, which, after further examination by the Tribunal, was forwarded to the parties for their comments and observations.  In response to the parties' comments, Dr. Deep prepared and submitted to the Tribunal on July 22, 2013 his Final Report.  The parties made multiple submissions, including supporting reports from their own financial experts.  The Tribunal held a hearing on damages from September 19 through 21, 2013 in Washington, D.C.  Slater Decl., Ex. A ¶¶ 16-17.

40.      On April 9, 2015, the Tribunal made its ruling on damages.  Damages were calculated by use of a three-step process:

1.   Determining the value of the investment in the hypothetical situation where Argentina did not take the measures that the Tribunal had concluded violated its Treaty obligations (the "but-for" scenario);

2.   Determining the actual value of the investment (the "with measures" scenario); and

3.   Calculating the difference and applying an appropriate interest rate to bring the value current.

Slater Decl., Ex. A ¶ 28.

41.   In its damages analysis, the Tribunal assumed that AASA would have been viable and lasted the full thirty-year term of the concession but for the measures taken by Argentina that were in violation of the investment treaties, without explaining the basis for that assumption or reconciling it with its prior holding that the termination of the Concession Contract was not a treaty breach.  Slater Decl., Ex. A ¶¶ 31-32, 35-36, 48.  The Tribunal awarded damages for the losses it concluded the Claimants would have incurred through 2023, the end date of the Concession Contract.  Damages were awarded for: (1) losses on AASA's debts that the Claimants had guaranteed; (2) losses on the Claimants' equity investments in AASA; and (3) in the case of Suez, estimated losses on management fees.  *Id.* ¶¶ 116, 117.  The Tribunal declined to separately award losses on unpaid dividends, finding they were properly included in damages awarded for losses on equity.  *Id.* ¶ 104.

42.   Based on this analysis, the Tribunal awarded a total of $404,539,050 plus interest in damages to the Claimants.  Of that amount, Claimants Suez and Vivendi received well over 60% ($223,043,289 and $37,261,504 plus interest, respectively), while AWG was awarded $20,957,809 plus interest.  Slater Decl., Ex. A ¶¶ 116-117.[12]

---

[12]      This Court has jurisdiction to consider annulment only of the Award in favor of AWG.  The awards in favor of Suez, Vivendi, and AGBAR were made under the ICSID Convention, according to which only an Annulment Committee constituted pursuant to Article 52 of the Convention may set aside ICSID awards.  Argentina will bring separate proceedings at ICSID to seek annulment of those awards.

## GROUNDS REQUIRING THE AWARD TO BE VACATED

### I.   THE AWARD MUST BE VACATED BASED ON "EVIDENT PARTIALITY" OF AN ARBITRATOR UNDER SECTION 10(a)(2)

43.     The Award must be vacated because Professor Kaufmann-Kohler had a direct interest in the outcome of the case by virtue of her service as a director (and shareholder) of UBS, which was the largest investor in one Claimant and a "main shareholder" in a second Claimant, and which also recommended such investments to and made such investments for its clients.  Separately, the Award must be vacated due to Professor Kaufmann-Kohler's failure to disclose her acceptance of the appointment as director and her failure to investigate adequately the potential for the appointment to compromise her independence and impartiality.

44.     An arbitral award may be vacated "where there was evident partiality" on the part of one or more arbitrators.  9 U.S.C. § 10(a)(2).  This is because the FAA is intended "to provide not merely for any arbitration but for an impartial one."  *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 147 (1968).  "[E]vident partiality" does not require proof of actual bias.  *Morelite Constr. Corp. v. NYC Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 84 (2d Cir. 1984); *see also New Regency Prods., Inc. v. Nippon Herald Films, Inc.*, 501 F.3d 1101, 1105 (9th Cir. 2007) ("'Evident partiality' is distinct from actual bias."); *Schmitz v. Zilveti*, 20 F.3d 1043, 1046 (9th Cir. 1994) (holding evident partiality exists "when undisclosed facts show 'a reasonable impression of partiality'" and confirming that "proof of actual bias" is not required).  This is consistent with the UNCITRAL Rules, applicable to AWG's Arbitration against Argentina, which provide that "[a]n arbitrator may be challenged if circumstances exist that give rise to justifiable doubts as to the arbitrator's impartiality or independence." UNCITRAL Rules, Art. 10(1).

45.     Under 9 U.S.C. § 10(a)(2), evident partiality can be found not only in the relationship that gives rise to the apparent conflict – in this case, Professor Kaufmann-Kohler's direct fiduciary duties to and her personal interest in UBS – but also in an arbitrator's failure to properly investigate and disclose such a relationship.  *See Commonwealth Coatings*, 393 U.S. at 147-48.  This, too, is required by the UNCITRAL Rules, whose Article 9 requires an arbitrator "once appointed" to disclose "any circumstances likely to give rise to justifiable doubts as to [her] impartiality or independence."  Professor Kaufmann-Kohler was thus obligated not only to disclose her appointment to UBS' board, but to investigate how that appointment might intersect with the arbitrations, which would have identified and required disclosure of UBS' ties to Suez and Vivendi.  But Professor Kaufmann-Kohler failed to do so.

46.     On either or both of these grounds, the Award against Argentina should therefore be vacated.

## A.  PROFESSOR KAUFMANN-KOHLER'S DIRECTORSHIP IN UBS ESTABLISHES REASONABLE GROUNDS TO DOUBT HER INDEPENDENCE AND IMPARTIALITY

47.     An arbitral award should be vacated in cases, such as this one, where the arbitrator has a relationship "such that reasonable people would have to believe [that the relationship] provides strong evidence of partiality by the arbitrator."  *Morelite*, 748 F.2d at 85.  Professor Kaufmann-Kohler's relationship to UBS, and UBS' relationship to Claimants, created just such a situation for a number of reasons that individually and cumulatively mandate vacating the Award.

48.     At the time of Argentina's Challenge, UBS was the largest shareholder in Claimant Vivendi with a little over 2% of its shares and voting rights.  UBS was also a "main shareholder" in Suez with a little over 2% of its shares.  Slater Decl., Ex. K ¶¶ 24-25.  These positions arose both from direct investments by UBS and from UBS' purchase of shares for its

clients' accounts.  In addition to these shareholdings, throughout 2006 and 2007 UBS actively promoted and marketed investment in water concessionaires, including Claimants Suez and Vivendi.  Slater Decl., Ex. H ¶ 12.  UBS therefore had a number of direct interests in the outcome of the Arbitration.  First, UBS had "an obvious interest in seeing that the financial results of the Claimants involved are favorable in order to assure significant dividends and a rising stock price for itself."  Slater Decl., Ex. D ¶ 8.  Second, it had an interest – indeed, a duty – in promoting favorable results for its clients, for whom it had purchased shares in Claimants.  Third, it had "an economic interest in the success of the sector or firm in order to validate its expertise and acuity in making such recommendations."  *Id.*

49.     Professor Kaufmann-Kohler shared these interests.  As a member of UBS' board, she had a fiduciary responsibility to further UBS' interests; she plainly could not knowingly act contrary to UBS' interests.  Furthermore, Professor Kaufmann-Kohler had a direct financial interest in UBS' performance: at least half of her annual compensation of CHF 300,000 as a non-executive director was paid in UBS shares.  Argentina's Additional Observations and Comments (Jan. 7, 2008), Slater Decl., Ex. J ¶ 93.  That is, Professor Kaufmann-Kohler's compensation as a director of UBS was tied, through her receipt of UBS shares, <u>directly</u> to the financial performance of the entities in which UBS had invested, including Claimants Vivendi and Suez.

50.     In rejecting the challenge, the Tribunal asserted that the Arbitration would have a "negligible effect on the share price of Vivendi and Suez and certainly on the financial fortunes of UBS," Slater Decl., Ex. H ¶ 36, but it provided no analysis to support its conclusion, nor did it reckon with the fact that the economic interests were direct.  Failure to disclose even "the slightest pecuniary interest" is a basis for disqualification.  *Commonwealth Coatings*, 393 U.S. at 148.  The disqualifying facts in that case were that the arbitrator failed to disclose that his

company had done "sporadic" business in the past with an entity whose conduct was at issue in

the arbitration, with fees amounting to "about $12,000 over a period of four o[r] five years." *Id.*

at 146; s*ee also id*. at 151-52 (White, J., concurring) (arbitrator failed to disclose his "substantial

interest in a firm which has done more than trivial business with a party"); *Applied Indus.*

*Materials Corp. v. Ovalar Makine Ticaret ve Sanayi, A.S.*, 492 F.3d 132, 139 (2d Cir. 2007)

(finding relationship between party and subsidiary of arbitrator's company to be nontrivial where

it generated $275,000 in revenue).

51.    Indeed, even more remote interests have been found to warrant vacating awards

for evident partiality under the FAA.  For example, in *New Regency*, the challenged arbitrator

had, during the pendency of the arbitration, accepted a position as "'Senior executive vice

president and chief administrative officer'" at a film company that, at the time of the arbitration,

was in negotiations to finance a film that had been developed by New Regency, a party, and

would be produced by one of New Regency's production executives.  501 F.3d at 1107.  The

Ninth Circuit concluded that this prospective and indirect interest in the financial interests of a

party to the arbitration was "real and nontrivial" and therefore mandated vacating the award on

the basis of "evident partiality" under section 10(a)(2).  *Id.* at 1110.  Although the court could not

assign a particular monetary value to the project under negotiations, and therefore to the

arbitrator's interest, it noted that "we cannot conclude that the negotiation was <u>unimportant</u> to"

the film company.  *Id.* at 1111 (emphasis added).

52.    Similarly, in the present case, Claimants' interests in AASA were not unimportant

to them – after all, those interests were the very subject of the arbitration, in which they claimed

over a billion dollars in damages.  Moreover, whereas the arbitrator in *New Regency* took a

position during the course of the arbitration in which he had a prospective indirect interest in one

of the parties, Professor Kaufmann-Kohler became a director of, and undertook fiduciary responsibilities to, a company (UBS) that had a <u>direct</u> and <u>current</u> financial interest in parties to the arbitration (Claimants Suez and Vivendi) and therefore in the outcome of the proceedings – indeed, most of the amounts awarded were for the benefit of Suez and Vivendi.

53.    The Tribunal attempted to distance Professor Kaufmann-Kohler from UBS by relying on her explanation that "as a director of UBS she is not involved in the management of UBS business, does not participate in the development and management of the company's financial products or its research activities, and indeed was unaware of its activities with respect to the water sector."  Slater Decl., Ex. H ¶ 23; *see id.* ¶¶ 37-39.  But all that means is that Professor Kaufmann-Kohler was not an executive of the company in addition to being a director. As Professor Wolfram explained, and the Tribunal nowhere addressed, regardless of Professor Kaufmann-Kohler's distance from day-to-day management, she would be constrained by "institutional loyalty."  *See* Slater Decl., Ex. D ¶ 12.  That she was not an executive member does not detract in the least from the fact that she was a member of the company's board of directors, with fiduciary duties and institutional loyalties to advance UBS' interests that surely may be presumed to influence, if not command, her not to act in ways that could harm those interests.[13] This sort of exogenous influence on the arbitrator is precisely what section 10(a)(2)'s proscription of "evidence partiality" is intended to root out.  *See Morelite*, 748 F.2d at 84 (vacating award where arbitrator's father was vice-president of the international union of which the party was a local chapter because of the loyalty a son would likely feel towards his father).

---

[13]    Professor Kaufmann-Kohler's designation as a non-executive director does not "remove[] all trace of conflict simply because it appears to be a less hands-on role than that of day-to-day management."  Slater Decl., Ex. D ¶ 14.  As Argentina stressed to the Tribunal, UBS' non-executive directors are not divorced from responsibility for the company's management or furthering its interests.  According to the Charter of the Board of Directors of UBS, "the Board of Directors shall mainly focus on the definition of the Company's strategic development, assuming *ultimate responsibility for the management of the Corporation*."  Challenge, Slater Decl., Ex. K ¶ 20 (emphasis in original).

54.     Moreover, Professor Kaufmann-Kohler shared a personal economic interest in the outcome of the arbitrations through her ownership of UBS stock.  The Tribunal's assertion that UBS' shareholdings in Claimants "in no way affect the compensation that Professor Kaufmann-Kohler earns as a director of UBS," Slater Decl., Ex. H ¶ 40, is obviously incorrect: Professor Kaufmann-Kohler was compensated in part by the award of UBS shares.  The purpose of such awards is to align the director's personal financial interests with the financial results of the company.[14]  To the extent that UBS had an interest in seeing that Claimants recover financially through the arbitrations, Professor Kaufmann-Kohler shared that interest.

55.     The leading guiding standards relevant to international arbitration, the IBA Guidelines on Conflicts of Interest in International Arbitration ("IBA Guidelines"), likewise show that the Award must be vacated.[15]  Other courts have taken persuasive account of the IBA Guidelines in considering § 10(a)(2) motions to vacate.  *See*, *e.g.*, *New Regency*, 501 F.3d at 1110; *see also* Federal Judicial Center, *International Commercial Arbitration: A Guide for U.S. Judges* 68 (2012), http://www.fjc.gov/public/pdf.nsf/lookup/strongarbit.pdf/$file/strongarbit.pdf ("The [IBA] Guidelines are considered persuasive rather than binding, but their provisions are widely relied upon by arbitrators and practitioners in the field [and s]everal U.S. courts have also invoked the Guidelines.") (footnote omitted).[16]  The IBA Guidelines, in addition to articulating general principles that must be followed to maintain arbitrator independence and impartiality,

---

[14]     *See, e.g.,* Jesse H. Choper et al., Cases and Materials on Corporations 156 (4th ed. 1995) ("Corporations grant stock options to executives and other employees primarily to afford them compensation that will encourage their efficiency and interest by giving them a 'priority stake' in the enterprise.").

[15]     The IBA Guidelines may be found at http://www.ibanet.org/Publications/publications_IBA_guides_and_free_materials.aspx.

[16]     Argentina raised the requirements of the IBA Guidelines to the Tribunal, *see* Slater Decl., Ex. K ¶¶ 60-64, but the Tribunal, in contrast with other international courts and tribunals, failed to address them.  *See, e.g., ICS Inspection & Control Servs. Ltd. (United Kingdom) v. The Republic of Argentina,* UNCITRAL, PCA Case No. 2010-9, Decision on Challenge to Mr. Stanimir A. Alexandrov, ¶¶ 2-4 (Dec. 17, 2009), http://www.italaw.com/documents/ICSArbitratorChallenge.pdf (relying on the IBA Guidelines as "reflect[ing] international best practices" to disqualify arbitrator).

attempt to describe a variety of scenarios and to classify whether under such facts the arbitrator must be disqualified, may serve only if the relationship is disclosed and the parties consent, or may serve without question.  Among them, the "Non-Waivable Red List" specifically lists conflicts so severe that, even with full knowledge and acquiescence of the parties, the arbitrator may not serve and, a fortiori, where a party has objected, the resulting award may not stand.  One of the "Non-Waivable Red List" conflicts is when "[t]he arbitrator is a manager, director or member of the supervisory board, or has a controlling influence on one of the parties or an entity that has a direct economic interest in the award to be rendered in the arbitration."  IBA Guidelines, Part II, Section 1.2.  Professor Kaufmann-Kohler was, without dispute, a member of UBS' board of directors, and for reasons discussed above, UBS had a direct economic interest in the award to be rendered in the arbitrations.  Professor Kaufmann-Kohler's relationship with UBS and UBS' interest in the outcome of these arbitrations therefore created reasonable grounds to doubt her ability to serve independently and impartially, and the Award cannot stand.

56.     In this regard, the fact that UBS' interests were in Suez and Vivendi, and not AWG, is immaterial to the analysis in this case.  AWG's claims were joined with those of Suez and Vivendi for hearing before a common Tribunal on which Professor Kaufmann-Kohler sat, the key factual and legal issues of the disputes were identical insofar as they derived from a common investment in AASA, and any award for Suez and Vivendi would necessarily result in an award for AWG.  For these reasons, justifiable doubts concerning her ability to serve based on her interest in the success of Suez and Vivendi necessarily apply with full force to her ability to hear the claims brought by AWG.  Indeed, as the Tribunal observed, "if it were established that Professor Kaufmann-Kohler were predisposed to favor the Claimants in the ICSID cases such predisposition would also favor [AWG] which is a partner with the other Claimants in the

Buenos Aires water privatization that is at the heart of the dispute in both ICSID Case no.

ARB/03/19 and the *AWG Case*." Slater Decl., Ex. H ¶ 21.

57. Because Professor Kaufmann-Kohler's service as a director of UBS created

"evident partiality" as a matter of U.S. law, and is equally proscribed by guiding international

standards, the Award should be vacated.

### B. PROFESSOR KAUFMANN-KOHLER'S FAILURE TO INVESTIGATE AND DISCLOSE THE POTENTIAL FOR CONFLICTS DEMONSTRATES EVIDENT PARTIALITY

58. Professor Kaufmann-Kohler accepted the appointment to the UBS board in April

2006, long after she became a member of the Tribunal, and before the Tribunal ruled on

jurisdiction. Before accepting a potentially conflicting duty, such as becoming director of a

major commercial enterprise, let alone a financial institution that regularly acquires stock of

different companies, Professor Kaufmann-Kohler had a duty to investigate and disclose to the

parties any potential for conflicts. These duties are ongoing throughout the arbitration. *See*

UNCITRAL Rules, Art. 9; *see also* Slater Decl., Ex. H ¶¶ 25, 47-48.

59. Failure to disclose a nontrivial connection to a party is a separate and independent

basis to vacate an award on the grounds of evident partiality. *See*, *e.g.*, *Olson v. Merrill Lynch,*

*Pierce, Fenner & Smith Inc.*, 51 F.3d 157, 159 (8th Cir. 1995) (vacating an arbitral award when

arbitrator failed to disclose "a substantial interest . . . as a high ranking officer" in a firm that "did

more than trivial business" with one of the parties to the arbitration); *see also Commonwealth*

*Coatings*, 393 U.S. at 151-52 (White, J., concurring) ("[W]here the arbitrator has a substantial

interest in a firm which has done more than trivial business with a party, that fact must be

disclosed.") (emphasis added). This is so because an arbitrator's decision to withhold

information regarding a potential conflict of interest, or decision to fail to investigate in certain

circumstances, is itself suggestive of partiality. *See Applied Indus.*, 492 F.3d at 138.

60.     Professor Kaufmann-Kohler's failure to investigate and disclose the connections arising from her service as director of UBS, of which she obviously "actually knew" and "failed to disclose," requires that the award be vacated.

61.     It is undisputed that Professor Kaufmann-Kohler did not disclose that she became a director of UBS, nor UBS' interest in Claimants Suez and Vivendi.  Professor Kaufmann-Kohler claims that she failed to disclose the connections between UBS and Claimants because she did not know about them at the time of her appointment, but ignorance does not provide a safe-haven.  As the Ninth Circuit observed, "[t]hough lack of knowledge may prohibit actual bias, it does not always prohibit a reasonable impression of partiality."  *Schmitz*, 20 F.3d at 1048. A failure to disclose based on lack of knowledge – particularly in cases such as this where that lack of knowledge is a direct result of a failure to conduct a reasonable inquiry – cannot be excused.  "[W]hen an arbitrator knows of a potential conflict, a failure to either investigate or disclose an intention not to investigate is indicative of evident partiality."  *Applied Indus.*, 492 F.3d at 138; *see also Schmitz*, 20 F.3d at 1049 (Arbitrator "had a duty to investigate the conflict at issue.").

62.     Professor Kaufmann-Kohler's claim that she did not consider that the business relations of UBS could affect her independence and impartiality in arbitrations, Slater Decl., Ex. H ¶ 14, is not worthy of credit, even on its own terms.  The fact is that, rather than conduct an inquiry herself, she outsourced it by "delegat[ing] to UBS the critically important task of determining whether a 'conflict of interest' existed."  Slater Decl., Ex. D ¶ 17.  And when UBS told her that it was a sponsor of a boat in the America's Cup, she resigned from the America's Cup Jury to avoid any appearance of partiality.  Slater Decl., Ex. F.  No one has suggested that she had an economic interest in the outcome of any matters that might have come before that

jury.  But the appearance of partiality arose from loyalty to the entity of which she was a board

member.  A comparable, but stronger, appearance of lack of independence and impartiality arises

from UBS having an economic interest in the outcome of the award of an arbitral panel on which

she sat.  She should have asked, but apparently did not, about UBS' financial interests in the

parties involved in the arbitrations on which she sat.  Had she made the appropriate inquiry and

learned, and disclosed, that UBS had substantial direct interests in Suez and Vivendi, she should

have stepped down from these arbitrations, just as she stepped down from the America's Cup

Jury.  In any event, her lack of knowledge of UBS' interests was the result of a lack of adequate

inquiry on her part, not of the absence of any need to inquire.

     63.    The Tribunal did not expressly decide whether Professor Kaufmann-Kohler had a

duty to investigate at the time of her appointment by UBS, Slater Decl., Ex. H ¶ 46, but instead

excused her conduct on the basis that she

> had reason to rely on the UBS examination of [conflicts of interest]
> since UBS, under Swiss banking law . . . had a strong incentive to
> ascertain her independence because the company would have
> encountered legal and regulatory difficulties should it represent her
> as an independent director and later find that a court, regulatory
> agency, or stock exchange had determined her to be [a] non-
> independent director . . . .

*Id.* ¶ 48.  With respect, the Tribunal's reasoning responds to the wrong question.  UBS required

information from Professor Kaufmann-Kohler to meet the standards of independence from

management for purposes of Swiss banking law and other regulations, *i.e.*, for its own interests.

UBS was never asked, and in any event could not be relied upon to determine, whether her new

ties to UBS would impact her independence and impartiality from the perspective of governing

arbitral law.  That inquiry was Professor Kaufmann-Kohler's responsibility, but she did not make

it.

64.     This case is thus not at all like *Al-Harbi v. Citibank, N.A.*, 85 F.3d 680 (D.C. Cir.

1996).  At issue was whether the arbitrator was required to investigate potential conflicts of

interest between his underline former law firm and the parties to the arbitration.  In that circumstance, and

with "nothing else appearing," the court declined to vacate the award on the basis of the failure

to investigate what would have been "facts underline marginally disclosable under the *Commonwealth*

*Coatings* duty."  *Id.* at 683 (emphasis added).  In this case, the issue was not historical contacts,

but rather whether, upon appointment to the board of directors for a major international financial

services firm with economic interests in many other companies, the arbitrator had an obligation

to investigate those economic interests.  Surely she did, for reasons already discussed, and then

she had a duty to disclose those interests when they intersected the parties who were appearing

before her as an arbitrator, which were not merely "marginally disclosable," but indicative of a

non-waivable conflict.  At the very least, disclosure of the board appointment was required, at

which point the parties could have inquired further.  But even that minimal step was not taken.

Under the logic of *Al-Harbi,* as well as the other cases cited above, annulment is therefore

warranted.

65.     Annulment on the present facts is also supported by strong policy reasons.  This is

not a situation where the losing party, after the fact, has combed through public records to search

for any spurious connection between an arbitrator and the winning party, such as a remote

contact through a former law firm.  Nor is this a case where "the small size and population of an

industry might require a relaxation of judicial scrutiny."  *Morelite*, 748 F.2d at 84.  Here,

Professor Kaufmann-Kohler was invited to become a director of UBS, for which she would

receive CHF 300,000 in yearly compensation, during an ongoing arbitration in whose outcome

UBS had an economic interest.  It was her choice not to disclose that fact or to investigate UBS'

economic interests at the time of her appointment; Argentina properly challenged those choices immediately upon finding that Professor Kaufmann-Kohler had been so appointed.

66.      The *Commonwealth Coatings* rule, now reflected in the IBA Guidelines, was designed to avoid this situation.  While the Court was divided on whether the undisclosed relationship created actual bias, a solid majority of the Court held that disclosure was mandated, as was annulment in the absence of timely disclosure.  Writing for the Court, Justice Black explained that there is "no way in which the effectiveness of the arbitration process will be hampered by the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias."  *Commonwealth Coatings*, 393 U.S. at 149.  And in concurrence, Justice White (with Justice Marshall) joined the Court's holding "that where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed."  *Id*. at 151-52.  He continued, "If arbitrators err on the side of disclosure, as they should, it will not be difficult for courts to identify those undisclosed relationships which are too insubstantial to warrant vacating an award."  *Id*. at 152.

67.      Here, Professor Kaufmann-Kohler breached the fundamental obligations of disclosure and investigation, and instead favored her personal economic and reputational interests in joining the UBS board.  That alone is a sufficient basis for the Court to vacate the Award.  That the undisclosed relationships – UBS' direct and indirect economic interests in the outcome of the awards – were substantial makes it all the more important that the Court do so.  Argentina should not be bound by an award issued by a panel that included an arbitrator for whom there was a justifiable basis to question independence and impartiality, which is only compounded by Professor Kaufmann-Kohler's decision not to undertake proper inquiry and disclosure.

## II.     THE AWARD MUST BE VACATED UNDER SECTION 10(a)(4) BECAUSE THE TRIBUNAL EXCEEDED ITS POWERS

68.     An award may also be vacated where the arbitrators "exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a)(4).  In this case, the Tribunal exceeded its powers in violation of the BIT in at least two respects: (1) by awarding damages outside of the legal boundaries afforded by the BIT; and (2) by failing to apply international legal principles as required by the BIT.

69.     Arbitration is grounded in the consent of the parties, and awards cannot exceed the bounds of the arbitration agreement.  *See Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2068 (2013).  A corollary is that a court should not uphold an arbitrator's decision if it does not reflect an interpretation of the parties' agreement, but instead reflects the arbitrator's personal policy preferences.  "'[T]he task of an arbitrator is to interpret and enforce a contract, not to make public policy,' [and] the Court must vacate an award that disregards the parties' agreement in favor of the arbitrator's 'own view of sound policy.'"  *Hill v. Wackenhut Servs. Int'l*, 971 F. Supp. 2d 5, 10 (D.D.C. 2013) (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 (2010)).  Because the Tribunal here substituted its own policy determinations for the agreed-upon law of the Arbitration, the Award should be vacated.

### A.  THE TRIBUNAL IGNORED THE TERMS OF THE APPLICABLE LAW IN AWARDING DAMAGES

70.     Article 8(4) of the Argentina-UK BIT requires that the arbitral tribunal "decide the dispute in accordance with the provisions of this Agreement, the laws of the Contracting Party involved in the dispute, including its rules on conflict of laws, the terms of any specific agreement concluded in relation to such an investment and the applicable principles of

international law."  Ignoring this guidance, the Tribunal dispensed its "own brand of industrial

justice" in its award of damages.  *See*, *e.g.*, *Stolt-Nielsen*, 559 U.S. at 672; *Major League*

*Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 507 (2001).  Arbitrators are obliged to identify

and apply unambiguously applicable legal standards appearing on the face of the parties'

agreement.  *See*, *e.g.*, *Inter-City Gas Corp. v. Boise Cascade Corp.*, 845 F.2d 184, 187-88 (8th

Cir. 1988) (vacating award where arbitrator disregarded explicit terms of underlying agreement).

The Tribunal failed to comply with this mandate in key respects in reaching its determination on

damages.

> **1.     The Concession Contract Was Lawfully Terminated in 2006, and the**
> **        Tribunal Lacked Authority to Award Damages Arising After That Point**

71.     The Tribunal exceeded its authority when it awarded damages for the period after

Argentina's termination of the Concession Contract, which the Tribunal had previously found

did <u>not</u> violate the BIT.

72.     The Tribunal acknowledged it could only award damages as compensation for

international wrongful acts, *i.e.*, violation of the Argentina-UK BIT.  Slater Decl., Ex. A ¶ 26.

Arbitrators may not award damages for actions over which they have no jurisdiction or for

measures that have not been found in breach of the law applicable to the dispute between the

parties as defined under the relevant treaty or other applicable instrument.  Thus, the Tribunal did

not have authority to award damages on the assumption that the termination in 2006 would not

have taken place but for Argentina's conduct because, according to the Tribunal itself, the

termination was not an international wrongful act.  *See* Slater Decl., Ex. C ¶¶ 156, 246.

73.     Arbitrators are permitted to award damages only for illegal actions falling under

their jurisdiction as permitted by the arbitration agreement.  For example, in *Mala Geoscience*,

the court vacated the portion of an arbitrator's decision reassigning a patent because the

agreement assigning the patent required arbitration in a different jurisdiction.  The arbitrator was not permitted to interpret a second agreement, which gave him jurisdiction over a different dispute, to confer jurisdiction over the patent.  *Mala Geoscience AB v. Witten Techs., Inc.*, 2007 WL 1576318, at *6 (D.D.C. 2007); *see also In re Arb. Between Melun Indus., Inc. and Strange*, 898 F. Supp. 990, 993-94 (S.D.N.Y. 1990) (vacating award where arbitrator awarded damages beyond his proper jurisdiction).

74.     Similarly, here, the Tribunal was only authorized to award damages for actions in violation of the BIT.  After the Tribunal found that Argentina's termination of the Concession Contract did not violate the BIT, it had no jurisdiction to award damages after the date of the lawful termination, *i.e.*, March 2006.  The Tribunal tried to avoid this conundrum, which would have resulted, at least, in no damages being awarded based upon cash flows to the concessionaire corresponding to periods after March 2006, by suggesting that at the time of the breach, lawful termination was merely a risk AASA faced and should be accounted for in the discount rate it would apply to the hypothetical income stream over the project's lifetime.  "It is true that the risk of termination was always present in the Concession; however, that risk, along with other risks, would be accounted for in the rate applied to discount to present value the remaining twenty-one years of projected cash flows."  Slater Decl., Ex. A ¶ 36.  However, whatever the validity of the Tribunal's proposed strategy, it did not follow through by in fact adjusting the discount rate to account for the risk of termination.  *Id.* ¶ 101 (accepting Dr. Deep's hypothetical but-for valuation of AASA); Deep Final Report, Slater Decl., Ex. L ¶¶ 113-14, 248, App. D (calculating the cost of capital), App. H (explaining Dr. Deep's treatment of the risk of termination).[17]

---

[17]     Dr. Deep reasoned, "for determining the termination date of the cash flows for valuation under the but-for and the with-Measures scenarios, we assume that the contract would not have been terminated until the end of its 30-year Concession period . . . .  If the Concession Contract was terminated earlier, its valuation would have to be linked to the terms of that termination.  We do not know what those terms would have been, but any reasonable and

Further, the Tribunal determined the value of the investment taking into account hypothetical cash flows both prior and subsequent to termination.  Whatever the valuation method chosen, the Tribunal should not have increased damages by factoring in cash flows that AASA would never have collected because of a measure – termination – that was specifically found not to be in breach of the applicable treaties.  By failing to exclude from its damages calculation the consequences of the lawful termination, the Tribunal exceeded its powers, and the Award should be vacated pursuant to 9 U.S.C. § 10(a)(4).

> **2.     The Concession Contract Did Not Require Argentina to Ensure AASA's Viability, and the Tribunal Lacked Authority to Award Damages Assuming It Did**

75.     Second, the Tribunal deviated from the BIT's mandate to apply the terms of the Concession Contract by calculating damages on the basis of acts not required of Argentina pursuant to that Contract or applicable law.[18]  Courts have vacated arbitral decisions for excess of power where arbitrators have established liability or awarded damages on bases that are contradicted or disallowed by the plain language of the agreement.  *See*, *e.g*., *Melun Indus.*, 898 F. Supp. 990 (vacating award where arbitrator accepted arguments challenging original valuation of stock even though arbitration agreement only provided authority to decide disputes regarding changes in valuation during certain time period); *Inter-City Gas Corp.*, 845 F.2d 184.  For example, in *Inter-City Gas*, the Eighth Circuit vacated an award where the arbitrator disregarded the "plain and unambiguous" language of the contract in awarding damages.  The contract at issue involved payment for natural gas services, and the contract unambiguously specified how

---

fair termination would have to include a transfer between the Government and the Concessionaire of an amount equal to the remaining value of the Concession Contract at termination."  Slater Decl., Ex. L ¶ 443-44 App. H.

[18]     As noted by the Tribunal, "the Concession Contract at the heart of this dispute expressly provides that its text is to be interpreted according to specified laws and regulations constituting that legal framework and that in the event of conflict between the text and the Concession Contract and such other elements of the legal framework, the latter are to prevail."  Slater Decl., Ex. C ¶ 66.

those payments were to be calculated.  The arbitrator exceeded his powers in awarding damages based on a different payment amount.  *Inter-City Gas*, 845 F.2d at 189.

76.     In this case, the Tribunal calculated damages by reference to a "without measures" hypothetical value of concessionaire AASA based on what AASA would have been worth without Argentina's actions in violation of the treaties.  In making this valuation, however, the Tribunal relied on the assumption that Argentina should have taken certain measures to ensure AASA's continued financial health throughout the crisis.  *See* Slater Decl., Ex. A ¶ 42. But these measures were not required by the Concession Contract or any other law or agreement between the parties, nor was Argentina's failure to have taken such measure a basis for the Tribunal's finding of liability.  *See* Slater Decl., Ex. A ¶ 51; *see also infra* ¶¶ 78-79.  The Tribunal therefore exceeded its powers in awarding damages based on them.

77.     In this regard, moreover, before the Tribunal could award any damages for violation of the treaties on the basis of a "without measures" scenario, the Tribunal had to confirm the concessionaire's continued viability in the absence of treaty violations.  Instead, the Tribunal <u>assumed</u> AASA's continued viability, which Dr. Deep then confirmed only by hypothesizing that Argentina would have taken a number of steps that the Tribunal had not found to be required.  Deep Letter to Tribunal (Sep. 21, 2014), Slater Decl., Ex. M; *see also* Slater Decl., Ex. A ¶¶ 42, 45.  Although the Tribunal did not find that Argentina had any legal obligation to ensure AASA's viability and did not predicate liability on a failure to have done so, the Tribunal adopted Dr. Deep's approach after the fact to justify the assumption that AASA would have been viable.  *See* Slater Decl., Ex. A ¶¶ 42-45.[19]

---

[19]     The Tribunal assumed "1) tariffs would have been raised at the rate of inflation in 2002 and subsequent years; 2) *immediate liquidity relief* would be provided by the Argentine government in the form of an interest free loan or its equivalent, estimated at ARS 132.6 million, to AASA for a period of twelve months after the enactment of the Emergency Law to the extent that the additional revenue earned by AASA in 2002 from the increase in tariffs

78.     None of the steps suggested by Dr. Deep and adopted by the Tribunal were required by the Concession Contract.  For example, Dr. Deep's analysis was predicated on a requirement that Argentina provide AASA with liquidity relief in the form of an interest-free loan, even though the Tribunal acknowledged that the Concession Contract imposed no such obligation on Argentina.  Slater Decl., Ex. A ¶ 51.  Indeed, the idea that a country undergoing the worst economic, political, institutional, financial, and social crisis in its history would provide such a loan defies logic.  Second, taking account of poverty levels at the time, as well as Argentina's duty to secure the health and safety of its citizens, it would not have been feasible or realistic for Argentina to have raised the price of water and sewage services (and thus the tariffs) as Dr. Deep's analysis assumed.  Third, the Tribunal directly acknowledged that, "it is important to note three features of the legal framework at this point:  1) the term 'Equilibrium Principle' appears nowhere in the text of the Water Decree; . . . and 3) the Concessionaire was to assume the business risks of the operation."  Slater Decl., Ex. C ¶ 125.  Nonetheless, the Tribunal concluded that Argentina should have taken steps in accordance with the supposed "Equilibrium Principle" and awarded damages against Argentina on the basis of Argentina's failure to protect AASA against the business risks of the Concession.

79.     The Tribunal was authorized only to award damages for Argentina's breach of the relevant treaty.  Argentina was not obligated to maintain AASA's viability and solvency.  By awarding damages predicated on action or inaction that was not a violation of the Argentina-UK BIT, the Tribunal acted in excess of its authority, and the Award should be vacated.

---

failed to cover the increase in Argentine peso payments on AASA's dollar-denominated debt obligations; 3) AASA's Capital Expenditure Plan would be adjusted for the remainder of the Concession period to the level actually implemented or proposed by AASA; and 4) a full review of the economics of the Concession Contract would be conducted in 2003 whereby the tariff would be adjusted to ensure that the Concession Contract was in financial equilibrium of revenues and expenditures."  Slater Decl., Ex. A ¶ 45.

## B.  THE TRIBUNAL FAILED TO APPLY INTERNATIONAL LEGAL PRINCIPLES AS REQUIRED BY THE TREATY

80.     The Argentina-UK BIT requires that all disputes be decided in accordance with "applicable principles of international law."  Argentina-UK BIT Art. 8(4).  Applicable international law includes the exculpatory customary international law principle of necessity as largely reflected in the International Law Commission Articles on Responsibility of States for Internationally Wrongful Acts, Article 25 ("ILC Articles").  Rather than apply that principle, the Tribunal dispensed its own policy choices, in breach of the BIT and 9 U.S.C. § 10(a)(4).

81.     ILC Article 25 lists four factors relevant to the application of the necessity defense.  Two factors are relevant here.  First, Article 25(1)(a) states that necessity cannot be invoked to defend a State's actions unless those actions were "the only way for the State to safeguard an essential interest against a grave and imminent peril."  Second, Article 25(2)(b) prevents a State from invoking necessity if "the state has contributed to the situation of necessity."

82.     The Tribunal summarily concluded that it was "not convinced that the only way Argentina could satisfy that essential interest was by adopting measures that would subsequently violate the treaty rights of the Claimants' investments to fair and equitable treatment."  Slater Decl., Ex. C ¶ 260.  Equally summarily, the Tribunal concluded that "a combination of endogenous and exogenous factors contributed to the Argentine crisis at the beginning of this century."  *Id.* ¶ 264.

83.     On the same day as the Tribunal issued its Liability Decision rejecting the necessity defense, an ICSID Annulment Committee held that precisely this sort of summary disposition of this defense constituted a manifest excess of powers, warranting that the award at issue be vacated.  *Enron Creditors Recovery Corp., Ponderosa Assets, L.P. v. The Argentine*

*Republic*, ICSID Case No. ARB/01/3, Annulment Decision, ¶¶ 368-73 (July 30, 2010), http://www.italaw.com/sites/default/files/case-documents/ita0299.pdf ("Enron Annulment Decision").  The ICSID Annulment Committee explained that "only way" could have numerous legal definitions with very different practical consequences.  Therefore, a proper application of the standard required that one definition be adopted and explained.  Similarly, it held that different definitions of "contributed to" with their respective causal links and degrees of fault must be analyzed and explained with care before the necessity defense could be rejected.  Enron Annulment Decision ¶¶ 385-89.  Because the Tribunal here, like the panel considered in the Enron Annulment Decision, failed to define the applicable legal standards under customary international law, its summary rejection of Argentina's state of necessity defense was an excess of its powers.  The Court should therefore vacate the Award based on an excess of power under 9 U.S.C. § 10(a)(4).

## REQUEST FOR ORAL HEARING

84.     Because of the important issues presented in this petition concerning a matter affecting the interests of a foreign sovereign state, Argentina respectfully requests that the Court schedule oral argument on this petition.

## **CONCLUSION**

85.   For all the foregoing reasons, the Award should be vacated.


Dated:        July 6, 2015
              Washington, D.C.

Respectfully submitted,

*/s/ Matthew D. Slater*

Matthew D. Slater
DC Bar No. 386986
Teale Toweill
DC Bar No. 996061
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2000 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 974-1500
Facsimile: (202) 974-1999
mslater@cgsh.com
ttoweill@cgsh.com

*Attorneys for Petitioner The Republic of Argentina*