# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

REPUBLIC OF ARGENTINA,

                Petitioner,

                v.

AWG GROUP LTD.,

                Respondent.

Civil Action No. 15-1057 (BAH)

Judge Beryl A. Howell

## MEMORANDUM OPINION

The Republic of Argentina ("Argentina") filed this lawsuit seeking vacatur of an international arbitration award against the country in the amount of $20,957,809, plus interest, in favor of the respondent AWG Group Ltd. ("AWG"). Pet. to Vacate Arbitration Award ("Pet."), ECF No. 1. AWG, for its part, seeks confirmation, recognition, and enforcement of that same award. Cross-Pet. for Confirmation, Recognition and Enforcement of Award ("Resp.'s Cross-Pet."), ECF No. 12.[1] Argentina's instant petition is not the only effort by the country to avoid unfavorable arbitration awards arising out of disputes between Argentina and private consortia that contracted with Argentina to provide infrastructure and public services in the country. *See,*

---

[1] The parties agree that their competing motions are subject to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2519, T.I.A.S. No. 6997 ("New York Convention"), codified in the Federal Arbitration Act ("FAA") at 9 U.S.C. §§ 201 *et seq.*, and that this Court, consequently, properly exercises subject matter jurisdiction over this case, Pet. ¶ 8; Resp.'s Mem. in Opp'n Pet. to Vacate Arbitration Award and in Supp. of Cross-Pet. for Confirmation, Recognition and Enforcement of Award ("Resp.'s Mem.") at 22, ECF No. 12; *see* 9 U.S.C. § 203 ("An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States . . . shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy."); *Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71 (2d Cir. 2012) ("[T]he district court [has] subject-matter jurisdiction under 9 U.S.C. § 203, which provides federal jurisdiction over actions to confirm or vacate an arbitral award that is governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the 'New York Convention')").

*e.g.*, *BG Grp. PLC v. Republic of Argentina*, 134 S. Ct. 1198 (2014) (reversing the D.C. Circuit's vacatur of a $185 million dollar arbitration award against Argentina in favor of British firm that was part of consortium with a majority interest in an Argentine entity holding "exclusive license to distribute natural gas in Buenos Aires"); *Argentine Republic v. Nat'l Grid PLC*, 637 F.3d 365 (D.C. Cir. 2011) (affirming denial of Argentina's petition to vacate a $53 million dollar arbitration award and grant of respondent National Grid's cross-motion to confirm the same).

The arbitration award at issue in this case arises from a now-terminated thirty-year contract between Argentina and a private consortium, which included AWG, "to operate the water distribution and treatment systems serving the city of Buenos Aires." Resp.'s Mem. in Opp'n Pet. to Vacate Arbitration Award and in Supp. of Cross-Pet. for Confirmation, Recognition and Enforcement of Award ("Resp.'s Mem.") at 1, ECF No. 12.[2] AWG alleges that fewer than ten years into the contract, Argentina altered the investment framework, refused to authorize tariff adjustments, attempted to force a renegotiation of the contract, and ultimately terminated the contract, thereby breaching "Argentina's obligation to grant foreign investments 'fair and equitable treatment'" and "Argentina's obligation to provide foreign investments 'full protection and security'" under the governing bilateral investment treaty between the United Kingdom and Argentina, the Agreement Between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the Republic of Argentina for the Promotion and Protection of Investments, Arg.-U.K. ("UK-BIT"). *Id.* at 7–9. The UK-BIT provides for binding international arbitration arising out of an investment, Resp.'s Cross-Pet., Ex. 6 to Decl. of Elliot Friedman ("Friedman Decl."), Agreement Between the Government of

---

[2]    Resp.'s Cross-Mot. and Resp.'s Mem. are docketed together at ECF No. 12.  Further, Resp.'s Mem. is also docketed, in duplicate, at ECF No. 10 as the respondent's Answer.  To simplify citation, the Court will reference only one of the duplicate memoranda, and hereinafter, the Court will refer only to the memorandum at ECF No. 12.

the United Kingdom of Great Britain and Northern Ireland and the Government of the Republic

of Argentina for the Promotion and Protection of Investments, Arg.-U.K., Dec. 11, 1990 ("UK-

BIT"), ECF No. 12-7, *available at* 1765 U.N.T.S. 33, 38, and when the country where the award

is made is a signatory to the Convention on the Recognition and Enforcement of Foreign Arbitral

Awards ("New York Convention"), codified by reference at 9 U.S.C. §§ 201 *et seq*., that

convention governs enforcement of the award, *see* New York Convention, arts. I, III.

     In accordance with the terms of the UK-BIT, the parties' dispute was submitted to

binding international arbitration before an expert tribunal (the "Tribunal"), which confirmed its

jurisdiction, *see* Pet., Ex. B to Decl. of Matthew Slater ("Slater Decl."), *AWG Grp. Ltd. v. The*

*Argentine Republic*, Decision on Jurisdiction (Aug. 3, 2006) ("Decision on Jurisdiction"), ECF

No. 1-5, and after twelve years of proceedings entered a final award in favor of AWG in April

2015.  Resp.'s Mem. at 1, 4, 11–12.  Argentina now seeks to vacate the Tribunal's award under

the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10, arguing that one of the arbitrators acted with

"evident partiality," and that the Tribunal exceeded its powers, Pet. ¶¶ 2–3.[3]  For the reasons

explained below, Argentina's request to vacate the Tribunal's award is denied and AWG's cross-

petition to confirm the award is granted.[4]

---

[3]     Argentina requests a hearing on its petition to vacate the arbitration award but, given the sufficiency of the ample briefing, this request is denied.  *See* U.S. Dist. Ct. Rules, D.D.C., Local Civil Rule 7(f) (allowance of oral hearing is "within the discretion of the Court").

[4]     AWG has requested the posting of a pre-judgment bond, Mot. Pre-J. Bond ("Resp.'s Mot. Bond"), ECF No. 13, but this request is denied as moot since the pending motions are resolved and judgment is entered in AWG's favor with this Memorandum Opinion.  *See Republic of Argentina v. BG Grp. PLC*, 715 F. Supp. 2d 108, 115 n.6 (D.D.C. 2010) ("[T]he Court concludes that the posting of a bond is unnecessary, in light of the Court's conclusion here that Argentina's petition to vacate or modify the Award is entirely without merit.  Accordingly, . . . BG Group's cross-motion for a pre-judgment bond is denied as moot.").

## I.   BACKGROUND

Summarized below is the factual and procedural background pertinent to the resolution of the pending motions.[5]

### A.  The Concession Contract

On December 28, 1992, Argentina awarded a concession for the "provi[sion of] water and sewage services to Buenos Aires and surrounding municipalities" to a private consortium, which included AWG, a British corporation.  Pet. ¶¶ 5, 13–14; Pet., Ex. C to Slater Decl., *AWG Grp. v. The Argentine Republic*, Decision on Liability (July 30, 2010) ("Decision on Liability") ¶¶ 1, 33, ECF No. 1-6.  Prior to this award, Argentina had declared its public services to be in "a state of emergency" and had taken steps to establish "a regulatory framework to privatize certain public services."  Pet. ¶¶ 10–11; Decision on Liability ¶¶ 28–31.  Under this scheme, concessionaires would provide services, new capital, and technology, and in turn, "would be entitled to the payment of tariffs."  Pet. ¶¶ 11–12; Decision on Liability ¶¶ 30–32.  To attract "the necessary long-term private and foreign capital," the new regulatory framework:  (1) pegged the Argentine peso to the United States dollar at a ratio of 1:1; and (2) permitted tariff adjustments "to take account of changing and unexpected circumstances."  Resp.'s Mem. at 5–6; Decision on Liability ¶¶ 29, 124.  Argentina also entered into more than fifty bilateral investment treaties, including the UK-BIT,[6] through which the countries sought to "encourage cross-border private investment."  Resp.'s Mem. at 4; Decision on Liability ¶¶ 29, 124.

The Buenos Aires water and sewage concession was granted to a consortium comprised of AWG and other foreign and Argentine companies, which together formed and operated as an

---

[5]     The parties have filed a number of exhibits in this case that are immaterial to the legal conclusion reached here and, consequently, merit no discussion.
[6]     The UK-BIT was signed on December 11, 1990, but came into force on February 19, 1993.  UK-BIT at 33–34.

Argentine company named Aguas Argentinas S.A. ("AASA").[7]  Pet. ¶ 13; Decision on Liability

¶¶ 32–33.  On April 28, 1993, AASA entered into a thirty-year contract with Argentina (the

"Concession Contract").  Pet. ¶ 14; Decision on Liability ¶ 34.  In accordance with the

requirement in the Concession Contract to provide an "upfront investment to improve and

expand the system," AASA obtained loans from multilateral lending agencies, payable in United

States dollars, while AASA had agreed to receive tariff payments in Argentine pesos, which

were pegged under the terms of the Concession Contract to the United States dollar at a ratio of

1:1.  Pet. ¶ 15; Decision on Liability ¶ 35.  The Concession Contract included a termination

clause "allowing termination under specified circumstances, including termination for the

concessionaire's fault."  Pet. ¶ 16; Decision on Liability ¶ 114.

By 2001, AASA had invested $1.7 billion in the Concession Contract, "yield[ing]

substantial improvements in the water distribution and sewage system serving Buenos Aires."

Resp.'s Mem. at 6; Decision on Liability ¶¶ 35–36.  Around this time, however, Argentina

"began to experience significant economic difficulties that would eventually lead to a financial

crisis having serious consequences for the country, its people, and its investors, both foreign and

national."  Decision on Liability ¶ 41; Pet. ¶ 18.  "[T]o return stability to the country," Argentina

adopted "a series of policies and measures," including, in 2002, Emergency Law No. 25,561.

Pet. ¶ 19; Decision on Liability ¶ 44.  This measure, *inter alia*:  (1) "abolished the currency board

that linked the Argentine peso to the U.S. dollar, which was followed by a significant

depreciation of the Argentine peso;" (2) "abolished the adjustment of public service contracts

according to the agreed-upon indexations;" and (3) "authorized the Executive branch of the

---

[7]      The consortium included the following other companies: Suez, Vivendi Universal, S.A. ("Vivendi"),
Socieded General de Aguas de Barcelona S.A. ("AGBAR"), Banco de Galicia y Buenos Aires S.A., Socieded
Comercial del Plata S.A., and Meller S.A.  Pet. ¶ 13; Decision on Liability ¶ 32.

government to renegotiate all public service contracts."  Pet. ¶ 19; Decision on Liability ¶ 44.

The Emergency Law "also forbade concessionaires from suspending or altering their contractual

performance."  Resp.'s Mem. at 7; Decision on Liability ¶ 44.  These policies and measures,

particularly the unpegging of the Argentine peso from the United States dollar, "had a ruinous

effect on AASA's cash flows, because AASA's tariffs were calculated in Argentine pesos while

its debt obligations were necessarily denominated in U.S. dollars."  Resp.'s Mem. at 7; Decision

on Liability ¶ 50.

Starting in March 2002, Argentina and AASA engaged in negotiations "to adjust the

terms of the Concession Contract," but were unable to come to an agreement.  Pet. ¶ 20;

Decision on Liability ¶¶ 46–47, 49–50.  Argentina ignored or rejected AASA's requested "tariff

adjustments and modifications to its operation conditions" and, instead, "demanded that AASA

provide water and sewage services to areas outside the scope of [the Concession Contract]" and

"insisted that AASA continue to comply fully with its investment obligations."  Resp.'s Mem. at

7; Decision on Liability ¶¶ 44–51.  Argentina also "alerted AASA to several significant

performance failures in violation of the Concession Contract."  Pet. ¶ 20; Decision on Liability ¶

52.

In September 2005, the AASA requested termination of the Concession Contract, which

Argentina refused.  Resp.'s Mem. at 7; Decision on Liability ¶ 53.  Several months later, in

March 2006, Argentina terminated the Concession Contract for fault by AASA.  Pet. ¶ 21;

Decision on Liability ¶ 56.

### B.  The Arbitration

On April 17, 2003, after passage of the Emergency Law, but prior to the termination of

the Concession Contract, the foreign investors in AASA requested arbitration against Argentina

claiming that Argentina's actions "violate[d] three specific treaty provisions: 1) guarantees against direct and indirect expropriation of their investments; 2) guarantees to accord their investments full protection and security; and 3) guarantees to accord their investments fair and equitable treatment."  Decision on Liability ¶¶ 48, 127; *see* UK-BIT, arts. 2(2), 5.

Each of the foreign investors (hereinafter "Claimants") invoked Argentina's consent to arbitrate in the bilateral investment treaty governing their investment.[8]  Decision on Liability ¶¶ 1–2.  Since the other bilateral investment treaties provided for International Centre for Settlement of Investment Disputes ("ICSID") arbitration, Argentina and AWG agreed that the ICSID would also administer AWG's case, subject to the Arbitration Rules of the United Nations Commission on International Trade Rules ("UNCITRAL Rules"), which is a default international arbitration scheme provided for in the UK-BIT.  Decision on Liability ¶¶ 2, 4; BIT, art. 8(3).  This scheme permitted all of the foreign investors' claims to be arbitrated before the same tribunal.  Decision on Liability ¶¶ 2, 4; Pet. ¶ 24.

The Tribunal, appointed in fall 2003, was comprised of three members.  Decision on Liability ¶ 5; Pet. ¶ 24.  The Claimants appointed Professor Gabrielle Kaufmann-Kohler; Argentina appointed Professor Pedro Nikken; and, because the parties could not agree on a third arbitrator, ICSID appointed Professor Jeswald W. Salacuse to be the Tribunal President.  Decision on Liability ¶¶ 5–6; Pet. ¶ 24.  The seat of the arbitration was designated to be Washington, D.C.  Pet., Ex. A to Slater Decl., *AWG Grp. Ltd. v. The Argentine Republic*, Award (Apr. 9, 2015) ("Final Award") at i, ECF No. 1-4; Decision on Liability ¶ 9.

---

[8]  Suez and Vivendi's investments were governed by the 1991 Bilateral Investment Treaty between the Argentine Republic and France ("France-BIT"), while AGBAR's investment was governed by the 1991 Bilateral Investment Treaty between the Argentine Republic and the Kingdom of Spain ("Spain-BIT").  Decision on Liability ¶ 2.

Over the course of the arbitration, from the time of AWG's request for arbitration in April 2003 to the Tribunal's issuance of the final award twelve years later, in April 2015, the Tribunal issued five decisions. Decision on Liability ¶ 1; Final Award at i. In the first decision, issued on August 3, 2006, the Tribunal rejected Argentina's objections to the Tribunal's jurisdiction to hear the claims. Decision on Jurisdiction ¶ 69. The second decision responded to Argentina's request to remove Professor Kaufmann-Kohler from the Tribunal, because she had served as an arbitrator in a different case, in which the panel had already issued an award against Argentina. Resp.'s Mem. at 14. This challenge was rejected by "the two unchallenged arbitrators (including Argentina's appointee)," in accordance with agreed-upon procedures. Resp.'s Mem. at 14; Resp.'s Cross-Pet., Ex. 16 to Friedman Decl., *AWG Grp. v. The Argentine Republic* (Oct. 22, 2007) ("First Disqualification Decision") ¶¶ 12, 17, ECF No. 12-17 (citing ICSID Arbitration Rule 9(4)).[9] The third decision responded to a second request from Argentina to remove Professor Kaufmann-Kohler, following her appointment on April 19, 2006, to the Board of Directors of UBS ("UBS Board"), "on grounds that her directorship, and her decision not to disclose it, gave rise to justifiable doubts as to her impartiality and independence, in conflict with the ICSID Convention and the UNCITRAL Rules." Pet. ¶¶ 28–29; Pet., Ex. K to Slater Decl., Challenge to Mrs. Gabrielle Kaufmann Köhler ("Second Disqualification Challenge") at 1–2, ECF No. 1-14. The two unchallenged arbitrators, again, rejected Argentina's claim.[10] Pet., Ex. H to Slater Decl., *AWG Grp. Ltd. v. The Argentine Republic* (May 12, 2008) ("Second Disqualification Decision") ¶ 26, ECF No. 1-11. In any event, on April 15, 2009,

---

[9]     The First Disqualification Decision is not at issue in this action and Argentina has not objected to the procedure for reviewing challenges to arbitrators due to alleged bias.

[10]    In the Second Disqualification Decision, the two unchallenged arbitrators explain that it was "their understanding that in keeping with the parties' agreement that a single tribunal was to hear all three of the [related] cases the parties were bestowing on the remaining members the authority to decide the challenge under the UNCITRAL Rules in the case of *AWG Grp. Limited v. the Argentine Republic*." Second Disqualification Decision ¶ 13. According to the two arbitrators, Argentina did not object to "proceeding on this basis." *Id.*

nearly a year after the Second Disqualification Decision, "Professor Kaufmann-Kohler resigned

as an independent director [of UBS]" in order "to avoid any possible expression of doubt about

her arbitral independence."  Resp.'s Mem. at 22; Resp.'s Cross-Pet., Ex. 23 to Friedman Decl.,

*Kaufmann Kohler Leaves UBS Board*, Global Arbitration Review, May 1, 2009, at 1, ECF No.

12-24.

Over a year after Professor Kaufmann-Kohler had resigned from the UBS Board, the

Tribunal issued its fourth decision, on July 30, 2010, finding Argentina liable for failing to

provide the investments "fair and equitable treatment."  Decision on Liability ¶¶ 247–48.

Specifically, as described in the Decision on Liability, the Tribunal concluded that "Argentina's

actions in refusing to revise the tariff according to the legal framework of the Concession and in

pursuing the forced renegotiation of the Concession Contract contrary to that legal framework

violated its obligations under the applicable BITs to accord the investments of the Claimants fair

and equitable treatment."  *Id*. ¶ 247.[11]  The fifth and final Tribunal decision on damages owed by

Argentina, known as the "Final Award," was issued on April 9, 2015, and awarded a total of

$404,539,050, plus interest, to the Claimants, including $20,957,809, plus interest, to AWG.

Final Award at 58–62.[12]  AWG alleges that Argentina has not yet complied with the award, *see*

Resp.'s Mem. at 3, and Argentina does not dispute this assertion.

---

[11]     The arbitrator selected by Argentina, Professor Nikken, wrote a separate opinion from the other two arbitrators in the Decision on Liability, but nevertheless agreed that Argentina violated its obligation to give the Claimant's investments fair and equitable treatment.  *See* Pet., Ex. I to Slater Decl., Separate Opinion of Arbitrator Pedro Nikken ¶ 1, ECF No. 1-5 (citing differing grounds than the majority for reaching the same conclusion).

[12]     The Tribunal issued the Final Award in Washington, D.C.  Final Award at i.  Consequently, venue is proper in this district.  *See generally* 9 U.S.C. § 9 ("If no court is specified in the agreement of the parties, then [an application to confirm an arbitration award] may be made to the United States court in and for the district within which such award was made."); 9 U.S.C. § 10 (providing that the court "in and for the district wherein the award was made may make an order vacating the award").

### C. Procedural History

On July 6, 2015, Argentina petitioned to vacate the Tribunal's arbitration award on the grounds that the Tribunal acted with evident partiality, under 9 U.S.C. § 10(a)(2) (authorizing vacatur of arbitration award "where there was evident partiality or corruption in the arbitrators"), and that the Tribunal exceeded its powers by improperly calculating damages and failing to apply international law, under 9 U.S.C. § 10(a)(4) (authorizing vacatur of arbitration award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made"). *See generally* Pet. Less than two months later, on September 1, 2015, AWG filed a cross-petition to confirm the award, pursuant to 9 U.S.C. § 9, and Article IV of the New York Convention. *See generally* Resp.'s Cross-Pet. Both petitions are ripe for review.

## II.   LEGAL STANDARD FOR REVIEW OF CHALLENGED ARBITRATION AWARD

Review of arbitral awards is "extremely limited," *Kurke v. Oscar Gruss & Son, Inc.*, 454 F.3d 350, 354 (D.C. Cir. 2006) (quoting *Teamsters Local Union No. 61 v. United Parcel Serv., Inc.*, 272 F.3d 600, 604 (D.C. Cir. 2001)), and is "'not an occasion for *de novo* review.'" *Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71 (2d Cir. 2012) (quoting *Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004)). Courts "do not sit to hear claims of factual or legal error by an arbitrator" as they would "in reviewing decisions of lower courts." *Kurke,* 454 F.3d at 354 (internal citations and quotations omitted). Indeed, the standard of review of arbitral awards is so narrow that courts are "not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987). While an "arbitrator may not ignore the plain language of the contract . .

. [,] as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Id*. at 38.

The Supreme Court has explained that this high level of deference is required for arbitration awards because, "[i]f parties could take 'full-bore legal and evidentiary appeals,' arbitration would become 'merely a prelude to a more cumbersome and time-consuming judicial review process.'" *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2068 (2013) (quoting *Hall Street Assocs.*, *L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008)).  Thus, where the parties have chosen arbitration, they "must now live with that choice." *Id.* at 2071.

The fact that the document containing an arbitration agreement is a treaty does not "make[] a critical difference," since "[a]s a general matter, a treaty is a contract, though between nations." *BG Grp. PLC*, 134 S. Ct. at 1208.  "Consistent with the 'emphatic federal policy in favor of arbitral dispute resolution' recognized by the Supreme Court as 'appl[ying] with special force in the field of international commerce,' the FAA affords the district court little discretion in refusing or deferring enforcement of foreign arbitral awards . . . ." *Belize Soc. Dev. Ltd. v. Gov't of Belize ("Belize Soc. Dev. I")*, 668 F.3d 724, 727 (D.C. Cir. 2012) (alteration in original) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)).

## III.   DISCUSSION

Argentina urges vacatur of the arbitration award under two provisions of the FAA's § 10. First, due to Professor Kaufmann-Kohler's position on the UBS Board, and her alleged failure to investigate and disclose that position and its potential for conflict, Argentina contends vacatur is warranted under 9 U.S.C. § 10(a)(2).  Pet. ¶¶ 2, 43.  Second, because the Tribunal allegedly awarded damages outside of the legal boundaries afforded by the UK-BIT and allegedly failed to

apply international legal principles as required by the UK-BIT, Argentina argues that vacatur is also warranted under 9 U.S.C. § 10(a)(4). *Id.* ¶¶ 3, 68. AWG discounts these arguments as "groundless" and contends that the arbitration award must be confirmed because none of the statutory bases for vacatur exist. Resp.'s Mem. at 3. Following review of the statutory framework, Argentina's challenges to the Tribunal's arbitration award are addressed *seriatim* below.

### A. Statutory Framework

Both the United States and Argentina are parties to the New York Convention, which applies to arbitral awards made in the territory of a signatory country to the Convention. *See New York Convention*, art. I(1)); *Belize Soc. Dev. I*, 668 F.3d at 731 n.3 ("If the place of the award is 'in the territory of a party to the Convention, all other Convention states are required to recognize and enforce the award, regardless of the citizenship or domicile of the parties to the arbitration.'" (quoting *Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999))). The Supreme Court described the purpose of the New York Convention as to "encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). Thus, the Convention "provid[es] for 'the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought.'" *Belize Soc. Dev., Ltd. v. Gov't of Belize ("Belize Soc. Dev. II")*, 794 F.3d 99, 103 (D.C. Cir. 2015), *petition for cert. filed*, Dec. 24, 2015 (quoting New York Convention, art. I(1)). "The basic understanding of the New York Convention is that '[e]ach Contracting State shall recognize arbitral awards as binding and

enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the . . . articles [of the Convention].'" *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 934 (D.C. Cir. 2007) (alteration in original) (quoting New York Convention, art. III). "'[T]he critical element is the place of the award: if that place is in the territory of a party to the Convention, all other Convention states are required to recognize and enforce the award, regardless of the citizenship or domicile of the parties to the arbitration.'" *Id.* (quoting *Creighton Ltd.*, 181 F.3d at 121).

The New York Convention, which has been codified as chapter 2 of the FAA, 9 U.S.C. §§ 201–08, provides that a party may apply to any court with jurisdiction for confirmation of an arbitration award within three years of when the award is made, *id.* § 207. The court is required to "confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention." *Id.* Article V of the New York Convention sets forth the exclusive grounds for refusal of recognition and enforcement of the award. *See TermoRio S.A. E.S.P.,* 487 F.3d at 935 (noting that courts "may refuse to enforce the award [subject to New York Convention] only on the grounds explicitly set forth in Article V of the Convention." (quoting *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997))). As pertinent here, Article V(1)(e) provides for vacatur of an arbitral award that "has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made," New York Convention, art. V(1)(e), thereby authorizing parties to employ any grounds provided by domestic law in the jurisdiction where the award was made, "to the extent that" those domestic provisions are "not in conflict with" the New York Convention. 9 U.S.C. § 208. *See also Scandinavian Reins. Co.*, 668 F.3d at 71 (observing that "'FAA and the New York Convention work in tandem, and they have

overlapping coverage to the extent that they do not conflict'") (quoting *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 102 n.1 (2d Cir. 2006)); *Yusuf Ahmed Alghanim & Sons.*, 126 F.3d at 21 ("We read Article V(1)(e) of the [New York] Convention to allow a court in the country under whose law the arbitration was conducted to apply domestic arbitral law, in this case the FAA, to a motion to set aside or vacate that arbitral award.").[13]

Thus, when, as here, the award is made in the United States, the parties may, through Article V(1)(e), seek vacatur of the arbitration award under the FAA provisions applicable to domestic awards in 9 U.S.C. §§ 10 and 11. *See Zeiler v. Deitsch*, 500 F.3d 157, 164 (2d Cir. 2007) (finding, where "arbitration took place in the United States" but where significant aspects of the arbitration, including certain parties and the governing law were international, "the awards entered . . . are at the same time subject to the FAA provisions governing domestic arbitration awards" and the New York Convention); *see also Yusuf Ahmed Alghanim & Sons*, 126 F.3d at 23 ("The Convention specifically contemplates that the state in which, or under the law of which, the award is made, will be free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief.").

Under the domestic provisions of the FAA, the court must confirm an arbitration award unless there are statutory grounds to vacate, modify, or correct the arbitrators' decision. 9 U.S.C. § 9 ("[A]ny party to the arbitration may apply to the court [in and for the district within which such award was made] for an order confirming the award, and thereupon the court must grant

---

[13]     The New York Convention provides additional grounds for refusal to recognize or enforce an arbitral award, including: invalidity of the agreement to arbitrate, New York Convention, art. V(1)(a); lack of proper notice of the arbitration proceedings, *id.* art. V(1)(b); the award dealt with matters "not contemplated by or not falling within the terms of the submission to arbitration," *id.* art. V(1)(c); "[t]he composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place," *id.* art. V(1)(d);  or the award dealt with subject matter "not capable of settlement by arbitration under the law of," or "contrary to the public policy of," the country in which enforcement is sought, *id.* arts. V(2)(a)–(b).

such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of [the FAA].").[14]  Section 10 of the FAA provides the following four grounds for vacatur of an arbitration decision and award:

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).[15]

## B.  Argentina's Claim of Evident Partiality by a Tribunal Member

Invoking the grounds set out in the FAA's § 10(a)(2), Argentina contends that "[t]he [a]ward must be vacated because Professor Kaufmann-Kohler had a direct interest in the outcome of the case by virtue of her service as a director (and a shareholder) of UBS," Pet. ¶ 43,

---

[14]    The D.C. Circuit has authorized vacatur of an arbitral award based on a decision made "in manifest disregard of the law." *Kurke*, 454 F.3d at 354 ("In addition to the statutory grounds, 'arbitration awards can be vacated . . . if they are in manifest disregard of the law.'" (quoting *LaPrade v. Kidder, Peabody & Co.*, 246 F.3d 702, 706 (D.C. Cir. 2001))).  The Supreme Court has made clear, however, that the FAA's §§ "10 and 11 . . . provide the FAA's exclusive grounds for expedited vacatur and modification," *Hall St. Assocs.*, 552 U.S. at 584, leaving unclear whether a manifest disregard for law continues to provide a viable basis for vacating an arbitration decision, *see Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3 ("We do not decide whether 'manifest disregard' survives our decision in *Hall Street Associates* . . ."); *Republic of Argentina v. BG Grp. PLC*, No. 11-7021, 2014 U.S. App. LEXIS 9519, at *2 (D.C. Cir. May 21, 2014) (per curiam) (assuming, without deciding, that the manifest-disregard-of-law standard applies, but finding that the petitioner failed to meet that standard); *Regnery Publ'g, Inc. v. Miniter*, 368 F. App'x 148, 149 (D.C. Cir. 2010) (per curiam) (same); *STMicroelectronics, N.V. v. Credit Suisse Secs. (USA) LLC*, 648 F.3d 68, 78 (2d Cir. 2011) (expressing "skepticism about the validity of [the] 'manifest disregard' doctrine in light of recent Supreme Court precedent," but finding that the respondent had failed to meet it).  This issue need not be resolved here since Argentina does not raise "manifest disregard of the law" as a ground for vacatur.

[15]    Section 11 of the FAA, which is not relied upon by Argentina or at issue in this case, also authorizes modification or correction of an arbitration award where there is "an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award," 9 U.S.C. § 11(a), or "[w]here the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted" or "[w]here the award is imperfect in matter of form not affecting the merits of the controversy," 9 U.S.C. § 11(b)–(c).  As noted, FAA's § 11 is not at issue in this case.

and that this arbitrator's impartiality was further evidenced by her "failure to disclose her acceptance of the appointment as director and her failure to investigate adequately the potential for the appointment to compromise her independence and impartiality," *id*.  AWG responds that these claims are meritless in light of the deferential standard of review due to the two unchallenged arbitrators' Second Disqualification Decision, and that, in any event, Argentina has failed to demonstrate that Professor Kaufman-Kohler's position, or her failure to investigate or disclose the potential for conflict, amounted to the requisite "evident partiality" to refuse recognition and enforcement of the Final Award.  Resp.'s Mem. at 25–34.

### 1.   Relevant Background

Review of the chronology of events and the factual basis for the alleged partiality demonstrates that Argentina's challenge to one of the Tribunal members falls far short.  On July 17, 2003, the Claimants appointed Professor Kaufman-Kohler as one of three arbitrators to hear the Claimant's ICSID cases, including AWG's case at issue in this litigation.  Second Disqualification Decision ¶ 3.[16]  Subsequently, these three arbitrators on the Tribunal commenced hearings and issued decisions in the Claimant's cases, on such issues as "timetables and procedures on submission of documents, the jurisdiction of the tribunal, requests by a group of nongovernmental organization to participate as amicus curiae, the withdrawal of certain parties, and various other matters concerning the orderly management and processing of the arbitral proceedings."  *Id.* ¶ 6 (footnotes omitted).

---

[16]     The parties do not challenge the relevant factual record collected and summarized by the Tribunal in the Second Disqualification Decision or the Decision on Liability in this case.  *See* Pet.'s Sur-Reply in Supp. Pet. to Vacate Arbitration Award & in Opp'n Resp.'s Cross-Pet. for Confirmation, Recognition and Enforcement of Award ("Pet.'s Sur-Reply") at 8 n.4, ECF No. 20.  Accordingly, those facts are deemed undisputed and relied upon as the factual record in evaluating Argentina's claim of evident partiality on the part of a Tribunal member.

During this ongoing arbitration activity, on April 19, 2006, Professor Kaufmann-Kohler was appointed to a three-year term as a non-executive member of the UBS Board.  *Id.* ¶ 11.  At this time, "she submitted on a confidential basis a list of all her arbitrations to UBS and was subsequently informed by UBS that there were no conflicts of interest, except with respect to her position as a member of the America Cup Jury (since UBS sponsored a yacht in that competition), from which she resigned."  *Id.* ¶ 14.  Although the arbitration at issue in this case had already commenced and was disclosed in the conflicts check to UBS, Professor Kaufmann-Kohler did not disclose her new UBS Board position to the instant parties or other arbitrators. *Id.* ¶ 11.  In the spring and fall of 2007, the Tribunal held hearings on the merits of each of the Claimant's cases.  *Id.* ¶¶ 6, 8.

Upon learning of Professor Kaufmann-Kohler's appointment to the UBS Board over a year after her appointment, Argentina filed a challenge to disqualify Professor Kaufmann-Kohler from the arbitration proceedings on November 29, 2007.[17]  *Id.* ¶ 11.  This challenge was premised on UBS's ownership of shares in two members of the consortium responsible for "the Buenos Aires water privatization that is at the heart of the dispute."  *Id.* ¶ 21.  Specifically, "[a]ccording to the Vivendi web site, UBS was a 'main investor' in the corporation, holding 2.38% of its registered voting stock as of March 31, 2007.  UBS also held some 2.1% of the voting shares of Suez as of March 7, 2007."  *Id.* ¶ 12.  In its challenge, Argentina also pointed out that "UBS does research on and makes recommendations with respect to investments in the water sector, a sector in which the Claimants operate, and UBS has developed financial products that it sells to investors to permit them to invest in the water sector on a global basis."  *Id.*

---

[17]     Article 10(1) of the UNCITRAL Rules provides that: "An arbitrator may be challenged if circumstances exist that give rise to justifiable doubts as to the arbitrator's impartiality or independence."  Second Disqualification Decision ¶ 22.

Further, Argentina cited the fact that, as a non-executive member of the UBS Board, Professor

Kaufmann-Kohler is compensated for her services, in part, with UBS stock.  *Id.*  Notably, UBS is

not a shareholder of AWG.  *Id.* ¶ 21.

In a submission to the remaining two arbitrators determining the challenge, Professor

Kaufmann-Kohler explained that until Argentina's challenge was lodged, "she had no knowledge

of the business relationships alleged to exist between the Claimants and [UBS]."  Pet., Ex. F to

the Slater Decl., Letter from Gabrielle Kaufmann-Kohler to Gonzalo Flores (Dec. 21, 2007)

("Dec. 21, 2007 Kaufmann-Kohler Letter") at 1; Pet. ¶ 14.  After Argentina brought these

business relations to her attention, she requested that UBS "verify the accuracy of the UBS

shareholdings in the Claimants and was informed by the UBS Corporate Group General Counsel

that UBS held 2.38% of the shares and voting rights of Vivendi Universal on March 31, 2007

and 2.13% of Suez's share capital on March 7, 2007 and 1.3% on April 18, 2006."  Second

Disqualification Decision ¶ 14; Dec. 21, 2007 Kaufmann-Kohler Letter at 1.  Professor

Kaufmann-Kohler submitted to the remaining two arbitrators on the Tribunal additional

contextual information "that UBS, as a global financial institution, has many business

relationships with many corporations and states worldwide but that she as an independent, non-

executive director has no involvement in individual investment decisions and did not receive any

information about such individual investment decisions" and "that non-executive directors do not

deal with individual UBS client matters or transactions."  Second Disqualification Decision ¶ 14.

Similarly, UBS itself confirmed, "[a]ll these shareholdings are fairly small, if not

fractional.  They do not have a strategic meaning of any kind.  UBS would invest in hundreds, if

not thousands of commercial enterprises around the globe in a similar way.  Investment of this

magnitude lies within the ordinary course of business of our bank."  Second Disqualification

Decision ¶ 14 (quoting "communication of December 20, 2007 to Professor Kaufmann-Kohler signed by UBS' General Counsel and another Legal Advisor").

Notwithstanding the minimal nature of UBS's investments in two consortium members other than AWG and the challenged arbitrator's lack of knowledge about the UBS investments until alerted by Argentina, as well as her lack of any role or decision-making authority over UBS's investments, Argentina attempted to bolster its challenge by offering expert reports from Cornell University Law School Professor Charles W. Wolfram ("Wolfram Reports"). *Id.* ¶ 15; *see generally* Pet., Ex. D to Slater Decl., Expert Report of Charles W. Wolfram (Feb. 29, 2008); Pet., Ex. E to Slater Decl., Reply Expert Report of Charles W. Wolfram (Mar. 24, 2008). As noted by the unchallenged arbitrators, the Wolfram Reports focused almost entirely on consortium members, Suez and Vivendi, not AWG, to support Argentina's argument that Professor Kaufman-Kohler's position on the UBS Board rendered her impartial in evaluating AWG's claims. Second Disqualification Decision ¶ 15.

Ultimately, the unchallenged arbitrators of the Tribunal, including Argentina's appointed arbitrator Professor Nikken, concluded that Argentina's Second Disqualification Challenge must be dismissed for failure "to prove any fact indicating a manifest lack of independence or impartiality." *Id.* § V, ¶ 1. With respect to AWG, the unchallenged arbitrators reasoned that, "the only connection, if one may call it that, between Professor Kaufmann-Kohler and the Claimant AWG Group Limited is the fact that she is a director of UBS and that UBS, among its many other activities and interests throughout the world, conducts research and develops financial products related to the water sector," but they concluded that this connection is insufficient to give rise to "justifiable doubts as to an arbitrator's independence and impartiality." *Id.* ¶ 24. Based on this conclusion, the two unchallenged members further found that Professor

Kaufmann-Kohler was not required to disclose facts that would not have given rise to justifiable doubts as to impartiality.  *Id.* ¶ 26.  The two unchallenged members acknowledged "the possibility of a connection between the AWG case and the other two cases in the sense that if it were established that Professor Kaufmann-Kohler were predisposed to favor the Claimants in the ICSID cases such predisposition would also favor AWG Group Limited which is a partner with the other Claimants in the Buenos Aires water privatization," *id.* ¶ 21, but as they found no such predisposition, the arbitrators did not have occasion to address any implications of this connection, *see id.* ¶¶ 40, 48.[18]

Notwithstanding the two unchallenged arbitrator's findings, subsequent to the Second Decision on Disqualification, in an abundance of caution, Professor Kaufmann-Kohler cut short her UBS Board service and resigned from the UBS Board prior to the Decision on Liability and the Final Award.  *See* Resp.'s Cross-Pet., Ex. 22 to Friedman Decl., Form 20-F for UBS AG at 191 (2009 Annual Report noting Gabrielle Kaufmann-Kohler tendered her resignation at Annual General Meeting on April 15, 2009), ECF No. 12-23; *see also* Kaufmann Kohler Leaves UBS Board at 1 (contemporaneous interview by Professor Kaufmann-Kohler explaining that she resigned, in part, to avoid doubts arising about her independence "'in arbitration proceedings'").

## 2. Analysis

Section 10(a)(2) of the FAA provides that the Court may vacate an arbitration award "where there was evident partiality or corruption in the arbitrators, or either of them."  9 U.S.C. §

---

[18]     Argentina suggests, in a single sentence, that these two arbitrators were themselves impartial, claiming that the "decidedly dismissive approach" in the Second Disqualification Decision reflects that they "had a conclusion in mind – that their esteemed co-arbitrator, colleague, and friend would not be disqualified – and back-filled 'reasons.'"  Pet.'s Mem. in Opp'n Resp.'s Cross-Pet. for Confirmation, Recognition and Enforcement of Award & in Further Supp. Pet. to Vacate Arbitration Award ("Pet.'s Opp'n") at 30, ECF. No 17.  Nevertheless, Argentina did not move to disqualify the other arbitrators from the Tribunal, nor raise any challenge on evident partiality grounds to the unchallenged arbitrators in its petition here.  To the extent this suggestion amounts to a belated effort to impugn the impartiality of these two arbitrators, it merits no further discussion.

10(a)(2).[19]  The Supreme Court provided some guidance for evaluating evident partiality

challenges in its plurality opinion in *Commonwealth Coatings Corp. v. Continental Cas. Co.*, a

decision setting aside an arbitration award where one of the parties was a "repeated and

significant" customer of one of the arbitrators.  393 U.S. 145, 146 (1968).  Justice White, in his

concurring opinion, provided the narrowest reasoning for the decision to vacate the award for

evident partiality, observing that the "Court does not decide today that arbitrators are to be held

to the standards of judicial decorum of Article III judges, or indeed of any judges."  *Id.* at 150

(White, J., concurring).  Instead, noting that arbitrators are often "effective in their adjudicatory

function" because "they are men of affairs, not apart from but of the marketplace," Justice White

reasoned "that arbitrators are not automatically disqualified by a business relationship with the

parties before them if both parties are informed of the relationship in advance, or if they are

unaware of the facts but the relationship is trivial."  *Id.*  Nevertheless, "where the arbitrator has a

substantial interest in a firm which has done more than trivial business with a party, that fact

---

[19]        The parties disagree about the level of deference owed to the Tribunal's legal conclusion, based on an undisputed factual record, that no evident partiality was established.  Argentina argues that "[w]hen reviewing allegations under § 10(a)(2) of the FAA, courts apply a *de novo* standard," in reliance on a number of out-of-circuit and State court decisions, which are all inapposite since none of these decisions involved either, as here, judicial review of a reasoned decision by neutral arbitrators regarding the purported bias of a fellow arbitrator, or the applicable standard of review when presented by a record with such an arbitration decision.  Pet.'s Sur-Reply at 4–5 (citing *Flexsys Am. v. Local Union No. 12610*, 88 F. Supp. 2d 600, 602–04 (S.D. W.Va. 2000); *Sun Ref. & Mktg. Co. v. Statheros Shipping Corp.*, 761 F. Supp. 293, 301 (S.D.N.Y. 1991); *Wages v. Smith Barney Harris Upham & Co.*, 937 P.2d 715, 720–22 (Ariz. Ct. App. 1997); *Plastic Recovery Techs. Co. v. Samson*, No. 11 C 2643, 2011 WL 3205305 (N.D. Ill. July 28, 2011); *Adams v. Barnes*, No. 3:09-CV-1860-B, 2010 WL 2484251 (N.D. Tex. June 17, 2010); *Boll v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 04-80031-CIV, 2004 WL 5589731 (S.D. Fla. June 28, 2004); *Jason v. Halliburton Co.*, No. CIV.A.02-1593, 2002 WL 31319945 (E.D. La. Oct. 15, 2002)).  AWG urges application of the deferential standard of review generally accorded arbitral awards.  *See* Resp.'s Mem. at 25.  Such deference is consistent with the overwhelming weight of authority requiring deference to decisions of arbitration panels and the cautionary language in *Commonwealth Coatings* that: "The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality.  That role is best consigned to the parties, who are the architects of their own arbitration process, and are far better informed of the prevailing ethical standards and reputations within their business."  *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 151 (1968) (White, J., concurring).  Thus, the Court finds that deference should be given to the unchallenged arbitrators' Second Disqualification Decision.  In any event, as explained *infra*, under either deferential or *de novo* review, Argentina has failed to demonstrate evident partiality by a member of the Tribunal under 9 U.S.C. § 10(a)(2).

must be disclosed." *Id.* at 151–52.  Justice White also cautioned that "[t]his does not mean the judiciary must overlook outright chicanery in giving effect to their awards; that would be an abdication of our responsibility." *Id.* at 150.  Justice Black, writing for a plurality of four Justices, articulated a stricter ethical standard for arbitrators, finding that "we should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges," and that arbitrators must avoid even the "appearance of bias." *Id.* at 149, 151.[20]

Following the lead of Justice White's concurrence, the D.C. Circuit, in *Al-Harbi v. Citibank*, instructed that "'the burden on a claimant for vacation of an arbitration award due to 'evident partiality' is heavy, and the claimant must establish specific facts that indicate improper motives on the part of an arbitrator.'"  85 F.3d 680, 683 (D.C. Cir. 1996) (quoting *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 991 F.2d 141, 146 (4th Cir. 1993) (relying on Justice White's concurrence in *Commonwealth Coatings*)).  "'The alleged partiality must be direct, definite, and capable of demonstration rather than remote, uncertain or speculative.'" *Al-Harbi*, 85 F.3d at 683 (quoting *Peoples Sec. Life Ins. Co.*, 991 F.2d at 146) (internal quotation marks omitted).  "'[A] mere appearance of bias is insufficient to demonstrate evident partiality.'" *Hammad v. Lewis*, 638 F. Supp. 2d 70, 75 (D.D.C. 2009) (quoting *Alston v. UBS Fin. Servs., Inc.*, No. 04-01798, 2006 WL 20516, at *3 (D.D.C. Jan. 2, 2006)).

---

[20]     The divergence between the approaches of the plurality and Justice White's concurrence left the Court without a majority opinion and, under the rule in *Marks v. United States*, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'"  430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).  *See also In re Sealed Case*, 722 F.3d 361, 365–66 (D.C. Cir. 2013) (explaining when plurality versus concurring view is binding). Consequently, the narrow view articulated by Justice White for finding an arbitrator's "evident partiality" is binding.  *See Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 83 (2d Cir. 1984) (noting "murky backdrop of Supreme Court precedent" and that "much of Justice Black's opinion must be read as *dicta*").

Other circuits to have considered the issue have employed an objective test that "'evident partiality . . . will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration.'" *Scandinavian Reins. Co.*, 668 F.3d at 72 (quoting *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 84 (2d Cir. 1984)); *see also Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 645 (6th Cir. 2005) (same); *JCI Commc'ns, Inc. v. Int'l Bhd. of Elec. Workers, Local 103*, 324 F.3d 42, 52 (1st Cir. 2003) (same). Even though the D.C. Circuit has not expressly endorsed this standard, the parties appear to agree that it applies here. *See* Resp.'s Mem. at 26 (citing *Al-Harbi v. Citibank, N.A.*, No. 94-2425, 1995 WL 450523, at *2 (D.D.C. July 17, 1995)); Pet.'s Mem. in Opp'n to Resp.'s Cross-Pet. for Confirmation, Recognition and Enforcement of Award & in Further Supp. Pet. to Vacate Arbitration Award ("Pet.'s Opp'n") at 16, ECF. No 17 (stating award must be vacated where an arbitrator has a relationship "such that reasonable people would have to believe [that the relationship] provides strong evidence of partiality by the arbitrator" (alteration in original) (quoting *Morelite*, 748 F.2d at 85)).[21]

---

[21]     The parties disagree (1) whether partiality must be proven by clear and convincing evidence; and (2) whether findings by other arbitral panels regarding the challenged arbitrator's impartiality have any bearing on this case. These disagreements make no difference to the ultimate result in this case. First, while AWG asserts that "a party must establish by 'clear and convincing evidence'" the reasonable person standard, Resp.'s Mem. at 26 (citing district court adoption of "clear and convincing" burden of proof in *Al-Harbi*, 1995 WL 450523, at *2), Argentina posits that "neither a 'clear and convincing evidence' standard nor a requirement to prove actual bias has been adopted by the Circuit and they should not be applied here,'" Pet.'s Opp'n at 20 (footnote omitted). The Court need not resolve this disagreement over the burden of proof, because, even if that burden is less rigorous than "clear and convincing," it remains "heavy" and Argentina has failed to provide sufficient evidence of any partiality.

        Second, both parties contest the impact of the Disqualification Decisions and other arbitration decisions on the "reasonable person" standard. AWG argues that Argentina cannot demonstrate "evident partiality" for the simple reason that two unchallenged arbitrators in this case concluded that Professor Kaufmann-Kohler was impartial and, consequently, "not all reasonable persons 'would have to conclude' that [her] affiliation with UBS rendered her incapable of judging impartially." Resp.'s Mem. at 27–28 (citing, in addition, an arbitral decision in another investment-treaty dispute, *EDF International S.A. and others v. Argentina*, ICSID Case No. ARB/03/23, Challenge Decision Regarding Professor Gabrielle Kaufmann-Kohler ("EDF Decision") (June 25, 2008), ECF No. 12-20, rejecting partiality challenge to Professor Kaufmann-Kohler due to her position on the UBS Board); *see also* Resp.'s Notice of Suppl. Authority at 1–2, ECF No. 24 (noting that the EDF Decision was upheld by an ICSID annulment committee on February 5, 2016). In response, Argentina cites a different arbitration decision involving this challenged arbitrator, *Compania de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentina*, ICSID

Set against the "onerous standard for vacatur," *Al-Harbi*, 85 F.3d at 683, Argentina's claim of evident partiality rests entirely on Professor Kaufmann-Kohler's position as a non-executive member on the UBS Board for a limited three-year period, from April 19, 2006, to April 15, 2009, out of the twelve-year duration of the arbitration.  Despite the notable facts that UBS held no interest in AWG, that the challenged arbitrator served on the UBS Board for only a fraction of the time she served on the Tribunal, and that she had resigned from the UBS Board at the time of issuance of the Decision on Liability and the Final Award, Argentina points to UBS's investments in two of AWG's consortium partners and UBS's general investment activities in the water sector, as evidence of the challenged arbitrator's partiality.  This evidence is wholly insufficient to establish Argentina's claim of evident partiality for at least three reasons.

First, in the context of UBS's overall business, that company's interests in AWG's consortium partners, Suez and Vivendi, was inconsequential.  UBS "is among the world's largest financial services companies, with operations in over fifty countries, some 80,000 employees, and over 200,000 registered shareholders."  Second Disqualification Decision ¶ 10 (footnote omitted) (referencing www.ubs.com).  Indeed, illustrating the ubiquitous nature of UBS's business, Argentina itself was a client of UBS until January 17, 2005, after the arbitration proceedings had commenced.  *See* Resp.'s Cross-Pet., Ex. 24 to Friedman Decl., *AWG Grp. v. Argentine Republic*, Argentina's Additional Observations and Comments to Mrs. Kauffman-

---

Case No. ARB/97/3, Decision on the Argentine Republic's Request for Annulment of the Award rendered on August 20, 2007 ("Vivendi Annulment Decision") (Aug. 10, 2010), ECF No. 17-10; Pet.'s Sur-Reply at 14, in which the ICSID Annulment Committee raised serious concern about the "compatibility" of serving on a board of an international bank and as an international arbitrator, Vivendi Annulment Decision ¶ 218, but declined to annul the award since Professor Kaufman-Kohler and the parties were unaware of UBS's investment in Vivendi before the panel made the award, *id.* ¶¶ 234–35.  The Vivendi Annulment Decision is easily distinguishable on its facts, since the challenged arbitrator was not on the UBS Board at the time of the critical Decision on Liability or Final Award in this case.  Moreover, deference is owed to the disqualification decisions, which were resolved by impartial arbitrators.  *See supra* note 19.

Kohler Remarks (Jan. 7, 2008) ¶ 101, ECF No. 12-25 (Argentina acknowledging its relationship with UBS and noting that it ended on January 17, 2005).  UBS's investments in AWG's consortium partners, Suez and Vivendi, were "'fairly small, if not fractional,'" and amounted to only two of "'hundreds, if not thousands of commercial enterprises around the globe.'"  Second Disqualification Decision ¶ 14 (quoting "communication of December 20, 2007 to Professor Kaufmann-Kohler signed by UBS's General Counsel and another Legal Advisor").  These investments "represented a mere one-twentieth of one percent (0.056%) of UBS's total investments worldwide," Resp.'s Reply Mem. in Further Supp. Cross-Pet. for Confirmation, Recognition and Enforcement of Award ("Resp.'s Reply") at 10 (emphasis omitted), ECF No. 18, were within the "ordinary course of business of [the] bank," Second Disqualification Decision ¶ 14, and consisted mainly of shares held on behalf of third parties,  *See* Resp.'s Cross-Pet., Ex. 25 to Friedman Decl., *AWG Grp. Ltd. v. The Argentine Republic*, Claimant's Comments on the Respondent's Second Challenge to Professor Kaufmann-Kohler (Dec. 24, 2007) ¶¶ 23–30, ECF No. 12-26 (noting UBS held approximately one-eighth of the Suez shares on its own behalf, while the rest of the Suez shares and all of the Vivendi shares were held on behalf of third parties).  Indeed, the unchallenged arbitrators determined that "it is more likely that this arbitration, whatever its outcome, will have a negligible effect on the share price of Vivendi and Suez and certainly on the financial fortunes of UBS . . . . UBS's holding in Suez and Vivendi would have an insignificant effect on UBS profitability given the enormous size and scope of UBS global operations."  Second Disqualification Decision ¶ 36.  Argentina contends that there is no *requirement* that it must prove that the award at issue here would have an impact on Suez and Vivendi's share prices, and thus, UBS's bottom line, *see* Pet.'s Sur-Reply in Supp. Pet. to Vacate Arbitration Award & in Opp'n Resp.'s Cross-Pet. for Confirmation, Recognition and

Enforcement of Award ("Pet.'s Sur-Reply") at 9, ECF No. 20, but even so, the lack of this evidence in the record certainly does not help Argentina make its argument that the award would have had any effect on UBS.

Relatedly, since UBS had no more than a trivial interest in Suez and Vivendi, the challenged arbitrator's role at UBS and her compensation in UBS stock is likewise inconsequential. Courts have repeatedly rejected claims of evident partiality based on an arbitrator's attenuated investment in one of the parties or, as here, an entity with tangential investments in a party.[22] *Transit Cas. Co. v. Trenwick Reins. Co.*, 659 F. Supp. 1346, 1353 (S.D.N.Y. 1987) (denying vacatur on grounds that relationship was "trivial" where arbitrator owned stock in Cigna Corporation, which had a subsidiary, Cigna Holdings, which owned 100% of the Aetna Insurance Corporation, which in turn owned 7.6% of the shares of the challenging party's parent company); *Standard Tankers (Bahamas) Co. v. Motor Tank Vessel, Akti*, 438 F. Supp. 153, 160 (E.D.N.C. 1977) (finding arbitrator's ownership of "a small number of shares" in a party's parent company was immaterial where there was still "such a vast number of outstanding shares of stock"); *see also Sphere Drake Ins. Ltd. v. All Am. Life Ins. Co.*, 307 F.3d

---

[22] Argentina attempts to bolster its request for vacatur by citing cases where vacatur has been granted due to an arbitrator's direct or substantial business dealings with a party to the arbitration. Pet. ¶¶ 50–51 (citing, *e.g.*, *Commonwealth Coatings*, 393 U.S. at 146 (vacating award where relationship between arbitrator and party "went so far as to include the rendering of services on the very projects involved in this lawsuit"); *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 138 (2d Cir. 2007) (vacating award where a branch of the arbitrator's company was negotiating with a party to commence a business relationship); *New Regency Prods., Inc. v. Nippon Herald Films, Inc.*, 501 F.3d 1101, 1103 (9th Cir. 2007) (vacating award where arbitrator was senior executive of a company "negotiating with a production executive of one of the parties to the arbitration to finance and co-produce an important motion picture"); *Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 51 F.3d 157, 159 (8th Cir. 1995) (vacating arbitration award where arbitrator "did not disclose that he is vice-president, chief financial officer, and compliance officer for []an investment firm that underwrites and sells municipal bonds, or that his firm does a substantial amount of business with Merrill Lynch," one of the parties to the arbitration)). This reliance is misplaced. These cases are plainly inapposite since UBS had insignificant investments in non-parties, Suez and Vivendi, rendering the challenged arbitrator's role at UBS similarly immaterial for purposes of showing any partiality.

617, 621 (7th Cir. 2002) ("A judge can't hold even a single share of a party's stock, but this would not imply 'evident partiality' for purposes of § 10(a)(2).").[23]

The challenged arbitrator's role as a non-executive member of the UBS Board further demonstrates the attenuated nature of her relationship to the parties.  As a matter of course, this arbitrator "ha[d] no involvement in individual investment decisions and did not receive any information about such individual investment decisions" and "[did] not deal with individual UBS client matters or transactions."  Second Disqualification Decision ¶ 14.  This role in an intermediary company is far more remote relative to the parties than the types of long-standing, direct, and repeated business relationship with a party that has supported a finding of evident partiality by an arbitrator.  *See, e.g.*, *Schmitz v. Zilveti*, 20 F.3d 1043, 1044 (9th Cir. 1994) (arbitrator's law firm represented the parent company of a party in "at least nineteen cases during a period of 35 years"); *Morelite*, 748 F.2d at 84 (father-son relationship between an arbitrator and party).  Thus, the challenged arbitrator's role on the Board of a limited investor in non-parties Suez and Vivendi for a relatively short time period during the arbitration is so remote and trivial that no reasonable person would conclude she was partial to a party as a result of that relationship.  *Al-Harbi*, 85 F.3d at 683.[24]

---

[23]    Argentina argues that the relationships in these cases are *more* attenuated than the one between Professor Kaufmann-Kohler and AWG's partners, Suez and Vivendi, but even if that were the case, it does not change the fact that the relationship here is also attenuated.

[24]    Throughout its briefing, Argentina urges that the finding regarding the challenged arbitrator set out in the Vivendi Annulment Decision be followed here, Pet.'s Opp'n at 18–20; Pet.'s Sur-Reply at 14, but that arbitral decision fails to consider the issue of materiality and is, thus, unpersuasive.  In the Vivendi Annulment Decision, an appellate arbitral body, the ICSID Annulment Committee, reviewed an arbitration award made by a panel that included Professor Kaufmann-Kohler.  Vivendi Annulment Decision ¶ 1.  The claims raised by Argentina were the same as those at issue here—namely that Professor Kaufmann-Kohler's position on the UBS Board rendered her partial and biased towards the claimant, Vivendi.  Vivendi Annulment Decision ¶¶ 18–23.  The Annulment Committee found that a director's fiduciary duties are "fundamentally at variance with his or her duty as an independent arbitrator in an arbitration involving a party in which the bank has a shareholding or other interest, however small it may be,"  Vivendi Annulment Decision ¶ 217–18 (footnote omitted), and that, generally speaking, the position of board member of an international bank and international arbitrator "may not be compatible and should not be, or in a modern international arbitration environment, should no longer be combined,"  *id.* ¶ 218.

In further support of its position, Argentina cites the International Bar Association Guidelines on Conflicts of Interest in International Arbitration.  Pet. ¶ 55 (footnote omitted) (referencing IBA Guidelines on Conflicts of Interest in International Arbitration ("IBA Guidelines"), Int'l Bar Assoc. (2014), *available at* http://www.ibanet.org/Publications/ publications_IBA_guides_and_free_materials.aspx).  According to Argentina, these guidelines contain a "Non-Waivable Red List" of conflicts for arbitrators that cannot be waived, including when "[t]he arbitrator is a manager, director or member of the supervisory board, or has a controlling influence on one of the parties or an entity that has a direct economic interest in the award to be rendered in the arbitration."  IBA Guidelines, Part II, § 1.2.  Other courts have found these guidelines to be persuasive, but not binding authority.  *See, e.g., New Regency Prods., Inc. v. Nippon Herald Films, Inc.*, 501 F.3d 1101, 1103 (9th Cir. 2007).  In any event, the IBA Guidelines simply do not favor Argentina's position.  Instead, these Guidelines expressly focus on the substantive nature, or materiality, of a challenged arbitrator's financial or business interest in the award by requiring a controlling interest in an entity with, or some other "direct economic interest in," the award.  IBA Guidelines, Part II, § 1.2. Such a material interest is wholly absent on the part of the challenged arbitrator.

Second, the fact that UBS, "among its many other activities and interests throughout the world, conducts research and develops financial products related to the water sector," Second Disqualification Decision ¶ 24, contributes little to Argentina's claim of evident partiality.  Argentina cites no case law even suggesting that an arbitrator's position with a company that

---

Notwithstanding this finding, the Annulment Committee did not annul the award, as it determined that neither Professor Kaufman-Kohler, nor the parties, were aware of UBS's investment in Vivendi before the panel made the award.  *See id.* ¶¶ 234–35.  By finding that an arbitrator's position on the board of directors of an international investment bank always creates impartiality, no matter how small the connection between the investment bank and an arbitral party, the Annulment Committee's decision lacks consideration of materiality, an important element that United States law embraces, and in this respect this decision is inconsistent with domestic law applicable here.

invests in the same general sector as the parties gives rise to evident partiality. To the contrary, arbitrators are often called upon from relevant industries because they bring the benefit of expertise. *See Commonwealth Coatings,* 393 U.S. at 150 (White, J., concurring) (recognizing that arbitrators are often "of the marketplace"); *see also JCI Commc'ns*, 324 F.3d at 52 (noting that "mere fact that the panel included business rivals of one party does not rise to the level of evident partiality" because arbitrators from relevant industries bring expertise that "would be a considerable benefit").

Finally, given the attenuated business interest between UBS and AWG's business consortium partners, the challenged arbitrator had no duty to investigate and disclose these "marginally disclosable" facts. *Al-Harbi*, 85 F.3d at 683 (referencing *Commonwealth Coatings*, 393 U.S. 145, 149 (1968)). Indeed, the challenged arbitrator was not, prior to Argentina's requests for disqualification, aware of any relationship between UBS and the claimants, and had done her due diligence by conducting a conflicts check with UBS. *Cf. Ometto v. ASA Bioenergy Holding A.G.*, No. 12 Civ. 1328, 2013 WL 174259, at *4 (S.D.N.Y. Jan. 9, 2013) (finding even an inadequate conflicts check "not tantamount to 'evident partiality'"). Argentina's argument that a conflict check done by UBS is inadequate because it was an interested party, *see* Pet.'s Sur-Reply at 17–18, defies practicality. UBS is in the best position to know of its matters, and accordingly, it was eminently reasonable for Professor Kaufmann-Kohler to rely upon the institution to inform her of meaningful conflicts. Moreover, this is not a case like *Applied Indus.*, relied upon by Argentina, where the Second Circuit determined that an arbitrator, who was Chairman, President, and CEO of a multi-billion dollar company, upon learning of a potential conflict, should have conducted an investigation that would have uncovered an ongoing relationship for services between a subsidiary of that arbitrator's company and a party. 492 F.3d

132, 139 (2d Cir. 2007).  The Court found that the revenue from this relationship—$275,000—was nontrivial, and accordingly, that the arbitrator's failure "to investigate those discussions or disclose that he would make no further inquiries" amounted to evident partiality.  *Id.*

Unlike the relationship in *Applied Indus.*, however, the relationship between the challenged arbitrator as a non-executive director and UBS is far more remote than that between the operational Chairman, President, and CEO of a company and the company he serves.  Not only that, the relationship between UBS and AWG's co-claimants was more remote because UBS was only a trivial investor, in contrast to the ongoing service contract relationship at issue in *Applied Indus.*  In any event, once the challenged arbitrator was made aware of UBS's investment in AWG's partners, she immediately withdrew from deliberations, sought confirmation from UBS regarding "the accuracy of the UBS shareholdings in the Claimants," and disclosed that information as part of the underlying disqualification proceedings. *See* Second Disqualification Decision ¶¶ 13–14.  In other words, upon being made aware of a potential conflict, even a trivial one, Professor Kaufmann-Kohler more than fulfilled her duty to investigate.  *See Applied Indus.*, 492 F.3d at 139 (stating that "[o]nce the arbitrator [i]s aware that a nontrivial conflict of interest might exist, the calculus change[s]" and "the arbitrator ha[s] a continuing duty to ensure that neither he nor his corporation ha[ve] a direct or indirect interest in the outcome of the arbitration.") (internal quotation marks omitted)).  These efforts and actions taken by the challenged arbitrator in an abundance of caution confirms that the record here lacks any facts "that indicate improper motives."  *Al-Harbi*, 85 F.3d at 683.

In sum, the "evident-partiality standard is, at its core, directed to the question of bias." *Scandinavian Reins. Co.*, 668 F.3d at 73.  The record here does not objectively suggest that the challenged arbitrator had any reason to be biased against Argentina.  Thus, the Court agrees with

the conclusion of the two unchallenged arbitrators, whose decision is, in any event, due deference, that "[a]n objective analysis . . . does not . . . lead a reasonable, informed person to conclude that a justifiable doubt exists as to Professor Kaufmann-Kohler's impartiality or independence" with respect to AWG.  Second Disqualification Decision ¶ 24.

### C.    The Tribunal Did Not Exceed Its Powers

Argentina claims that the Tribunal exceeded its powers by failing to apply applicable law in its computation of damages and its evaluation of the necessity defense, warranting vacatur under the FAA's § 10(a)(4).  Close examination of these claims, however, demonstrates that the Tribunal acted well within its powers, and no vacatur is warranted on these grounds.

The FAA authorizes vacatur of an arbitration award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a)(4).  To succeed in vacating an award under § 10(a)(4), a party must demonstrate that the "arbitrator stray[ed] from interpretation and application of the agreement and effectively 'dispense[d] his own brand of industrial justice.'" *Stolt-Nielsen*, 559 U.S. at 671 (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam)).  "'[I]t is particularly necessary to accord the narrowest of readings to the excess-of-authority provision of section 10(d).  That provision does not, it must be stressed, confer on courts a general equitable power to substitute a judicial resolution of a dispute for an arbitral one.'"  *Kanuth v. Prescott, Ball & Turben, Inc.*, 949 F.2d 1175, 1180 (D.C. Cir. 1991) (quoting *Davis v. Chevy Chase Fin. Ltd.*, 667 F.2d 160, 165 (D.C. Cir. 1981) (analyzing prior version of statute when § "10(a)(4)" was numbered "10(d)").

The Supreme Court has cautioned that courts "have no business weighing the merits of the grievance [or] considering whether there is equity in a particular claim."  *Garvey*, 532 U.S. at

509 (alteration in original) (internal quotation marks and citation omitted).  Deference to an

arbitrator's judgment applies, even if the court is convinced that the arbitrator "committed

serious error."  *Id.* (internal quotation marks and citation omitted).  "Because the parties

'bargained for the arbitrator's construction of their agreement,' an arbitral decision 'even

arguably construing or applying the contract' must stand, regardless of a court's view of its

(de)merits."  *Oxford Health Plans*, 133 S. Ct. at 2068 (quoting *Eastern Associated Coal Corp. v.

United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 61 (2000)).  Argentina simply cannot

overcome this high hurdle requiring deference to the Tribunal's determinations.

### 1.   The Tribunal Did Not Exceed Its Power When It Awarded Damages

Argentina argues that the Tribunal exceeded its powers in awarding damages, claiming

that the Tribunal lacked authority (1) to award damages arising after the Concession Contract's

lawful termination in 2006, and (2) to calculate damages assuming that Argentina was required

to ensure AASA's viability.  AWG counters that "[t]he two damages-related excess of power

arguments presented in the Petition are nothing more than quarrels with the way the Tribunal

assessed the evidence and applied the law."  Resp.'s Mem. at 39.  Despite Argentina's efforts to

cloak its challenge to the amount of damages awarded as jurisdictional arguments under FAA §

10(a)(4), the Tribunal acted well within its authority in both interpreting the contractual terms

between the parties and the amount of damages owed.

Argentina concedes that "the Tribunal was only authorized to award damages for actions

in violation of the BIT," Pet. ¶ 74, which, in turn, required the Tribunal to look to "the applicable

principles of international law," UK-BIT, art. 8(4).  Neither the UK-BIT itself, nor the

UNCITRAL rules applicable here, expressly provide for awarding or calculating damages.  In

accordance with this direction in the UK-BIT, the Tribunal "look[ed] to customary international

law for the legal principles that govern the determination of damages."  Final Award ¶ 23.  As

the Tribunal explained, the articulation of international law principles in the Articles on

Responsibility of States for Internationally Wrongful Acts (2001) ("Articles"), which have been

adopted by the United Nations' International Law Commission ("ILC"), are "generally

considered as a statement of customary international law" and "both parties in this case have

relied [upon them] at various times."  *Id.* ¶ 24; *see also id.* ¶ 23 ("As both the Claimants and the

Respondent in this case have agreed in their pleadings, the legal basis for awarding

compensation in this case and the standard to be applied in determining the amount of that

compensation is therefore to be found in international law; however, they do not agree on the

specific content of the applicable international law principles and the way in which they should

be applied to the precise facts of these cases.  This Tribunal, like others, must therefore look to

customary international law for the legal principles that govern the determination of damages in

these cases.") (footnote omitted)).  Relying on these Articles, the Tribunal determined its

mandate "to award 'full compensation' to the Claimants for the injuries caused by Argentina's

treaty violations, to seek 'to wipe out all the consequences' of Argentina's illegal acts, and to

place the Claimants 'in the situation which would, in all probability, have existed' if Argentina

had not committed its illegal acts."  *Id.* ¶ 27.  Moreover, it determined "the basic standard to be

applied is that of full compensation [] for the loss incurred as a result of the intentionally

wrongful act."  *Id.*  Notably, Argentina does not question the Tribunal's mandate under

applicable principles of international law, but rather, Argentina challenges *how* the Tribunal

calculated such damages.

　　　　To assist with the calculation of damages, the Tribunal appointed an independent

financial expert, Dr. Akash Deep, Senior Lecturer in Public Policy at the John F. Kennedy

School of Government of Harvard University and a former Senior Economist of the Bank for International Settlements in Basel, Switzerland.  *Id.* ¶ 12; *see also* Pet., Ex. L to the Slater Decl., *AWG Grp. v. The Argentine Republic*, Final Report of the Financial Expert to the Tribunal (July 22, 2013), ECF No. 1-15; Pet., Ex. M to the Slater Decl., *AWG Grp. v. The Argentine Republic*, Response to the Tribunal's Query About the Failure of AASA (Sept. 21, 2014), ECF No. 1-16. The Tribunal determined, by applying customary international law principles on damages, that the process for calculating damages consisted of three steps:  (1) "determine the value of the investment in the hypothetical situation where Argentina did not take measures that violated its treaty obligations," (2) "determine the value of the investment as a result of the offending measures that Argentina did take," and (3) "subtract the second value from the first and then actualize that amount by means of an appropriate interest rate to arrive at the damages owing to the Claimants so as to put them in the financial position they would have been [in] had Argentina not breached the applicable BITs."  *Id.* ¶ 28.

The Tribunal noted that this damages calculation was complicated by the nature of the Claimants' investments.  *Id.* ¶ 29.  In particular, the stream of revenue intended to compensate Claimants for their early-on investments "depended on many variables, both foreseen and unforeseen, over the next three decades, including population growth in the area, general economic conditions, technological changes, labor conditions, management efficiency, inflation, operating costs, and many others."  *Id.*  To assist in accounting for these multiple variables, the Tribunal used an economic model, which was designed by Dr. Deep, and "sought to capture numerous relevant economic variables and to determine with a certain degree of mathematical precision their impact on each other and on the costs, revenues, and profitability of the Concession [Contract]."  *Id.* ¶ 30.

The Tribunal determined, as a preliminary matter, that the valuation period for calculating damages would begin at the point in time before Argentina's illegal actions took place. *Id.* ¶ 36. The Tribunal further determined that starting in 2002, when Argentina first breached the BITs, "the Claimants[] had the right to a revenue stream which would continue for another 21 years until the year 2023, not just for another five years until the year 2006 when, unknown to them in 2002, Argentina would terminate the Concession [Contract]." *Id.*

The Claimants detailed "five individual elements of loss as a result of Argentina's treaty violations: (1) loss on AASA's debts that the Claimants had guaranteed; (2) in the case of Suez, losses on future management fees (after 2002); (3) also in the case of Suez, losses on unpaid management fees earned before 2002; (4) losses on the Claimants' equity investments in AASA; and (5) losses on unpaid dividends due to the Claimants as shareholders of AASA." *Id.* ¶ 58. The Tribunal awarded damages for the first four of these elements, *id.* ¶¶ 68, 83, 86, 103, ultimately determining that the last element, "losses on unpaid dividends," was subsumed by the value of the shareholder's equity in AASA, *id.* ¶ 104.

As noted, Argentina raises two challenges to this damages calculation. First, Argentina argues that because the Tribunal concluded no violation of the UK-BIT occurred when Argentina terminated the Concession Contract in 2006, *see* Decision on Liability ¶¶ 156, 246, any damages encompassing projected cash flows after 2006 fall outside of arbitrators' scope of authority. Pet. ¶ 74. This was an argument presented to and rejected by the Tribunal. *See* Final Award ¶¶ 35–36. Specifically, in the underlying arbitration, Argentina unsuccessfully argued that "any injury incurred by the Claimants after the termination in 2006 was a matter to be resolved in Argentine courts according to the dispute resolution provisions of the Concession Contract." *Id.* ¶ 35 While Argentina correctly states that the Tribunal found no violation of the UK-BIT from the

2006 termination of the Concession Contract, the Tribunal at the same time found that

Argentina's wrongful acts occurred much earlier than 2006 and continued to flow thereafter. *Id.*

¶ 36 (noting that the Tribunal determined that the first breach of the treaties took place in 2002).

In other words, Argentina mischaracterizes the Tribunal's award of damages for post-2006

projected profits as damages "arising from termination of the Concession Contract," Pet.'s Opp'n

at 34, when they are not.

A review of the Final Award makes clear that the Tribunal did not award damages for the

termination of the Concession Contract itself, but instead determined that the UK-BIT violations

entitled the Claimants to future lost profits post-dating 2006 regardless of whether the

Concession Contract had been lawfully terminated in 2006.  The Tribunal reasoned:  "Under

international law . . . the Claimants' are entitled to full compensation for what they have lost as a

consequence of Argentina's treaty violations . . . . To limit the valuation period to five instead of

twenty-one years would, of course, seriously undervalue the investments lost as a consequence

of Argentina's treaty violations."  Final Award ¶ 36.  Accordingly, the Tribunal found that at the

time of the first breach in 2002, the claimants "had the right to a revenue stream which would

continue for another 21 years," and that the risk of termination (as did occur in 2006) "would be

accounted for in the rate applied to discount to present value the remaining twenty-one years of

projected cash flows."[25] *Id.*

When, as here, "it is contemplated that the arbitrator will determine remedies for contract

violations that he finds, courts have no authority to disagree with his honest judgment in that

---

[25]        Argentina's contention that the Tribunal did not "follow through by in fact adjusting the discount rate to
account for the risk of termination" is of no matter.  Pet. ¶ 74.  The Supreme Court has made clear that "Courts [] do
not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of
lower courts."  *United Paperworkers*, 484 U.S. at 38.  In fact "as long as the arbitrator is even arguably construing
or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious
error does not suffice to overturn his decision."  *Id.*  When, as here, the Tribunal undisputedly had the authority to
calculate damages, any error in that calculation is not subject to challenge under the FAA's § 10(a)(4).

respect." *United Paperworkers*, 484 U.S. at 38.  In this case, the Tribunal undisputedly had

jurisdiction under the UK-BIT to award damages for a violation, and upon finding a violation,

calculated those damages.  There is simply no evidence that in calculating damages, the Tribunal

exceeded its powers.  *See Oxford Health Plans*, 133 S. Ct. at 2071 ("Under § 10(a)(4), the

question for a judge is not whether the arbitrator construed the parties' contract correctly, but

whether he construed it at all.  Because he did, and therefore did not 'exceed his powers,' we

cannot give Oxford the relief it wants.").[26]

Second, Argentina argues that the Tribunal exceeded its powers by assuming in its

damages calculation that the country "should have taken certain measures to ensure AASA's

continued financial health throughout the crisis" and that AASA would have continued to be

viable in the absence of Argentina's treaty violations.  Pet. ¶¶ 76–77.  Although Argentina

asserts that none of these steps was required by the Concession Contract, *see id.* ¶ 78, the

damages in this case were based, in part, on "the hypothetical situation where Argentina did not

take measures that violated its treaty obligations."  Final Award ¶ 28.  In *Kanuth*, this Circuit

recognized that an arbitration damages award "based on accountant projections of future

earnings for a company that had existed for less than ten months" was "[b]y [its] very nature . . .

speculative," but was nevertheless entitled to deference.  949 F.2d at 1181.  Similarly, here, the

Tribunal was required to engage in some degree of speculation to determine the predicted cash

---

[26]    The non-binding cases cited by Argentina to support its argument that the Tribunal's damages award exceeded its authority, Pet. ¶¶ 73, 75, are distinguishable and therefore unpersuasive since, in each of those cases by contrast to the Tribunal here, the arbitrators acted in complete disregard or in violation of express language governing the parties' contract.  *See, e.g., Inter-City Gas Corp. v. Boise Cascade Corp.*, 845 F.2d 184, 188 (8th Cir. 1988) (finding arbitrator disregarded plain and unambiguous contract when fashioning arbitration award); *Mala Geoscience AB v. Witten Techs., Inc.*, No. 06-1343, 2007 U.S. Dist. LEXIS 38767, at *6 (D.D.C. May 30, 2007) (finding arbitrator awarded relief outside of the jurisdiction provided to him in the contractual scheme and vacating that portion of the arbitration award); *Melun Indus., Inc. v. Strange,* 898 F. Supp. 990, 993–94 (S.D.N.Y. 1990) (concluding arbitrator exceeded his powers where he made findings outside of express instructions in contract).

flows over the lifetime of the terminated contract.  As the Circuit made clear, where nothing "on

the face of the panel's lump-sum award" suggests "that the panel failed to construe the contract,"

any inquiry into "precisely how and why the panel derived the lump-sum award," is "clearly

outside of [the court's] limited scope of review."  *Id.* at 1182.  Merely because Argentina does

not agree with how the Tribunal calculated damages does not mean that the Tribunal lacked

jurisdiction to do so.

>### 2.  The Tribunal Did Not Exceed Its Powers When It Elected Not to Apply
>    the Principle of Necessity

Argentina claims that the Tribunal exceeded its power when it chose not to apply the

"exculpatory customary international law principle of necessity" and instead "dispensed its own

policy choices."  Pet. ¶ 80.  AWG dismisses this claim as "nothing more than a disagreement

with the Tribunal's factual and legal findings."  Resp.'s Cross-Pet. at 43. The Court agrees with

AWG.

As previously discussed, the UK-BIT required the Tribunal to look to "applicable

principles of international law" when deciding disputes, UK-BIT, art. 8(4), and Argentina is

correct that the necessity defense is such a principle.  The necessity principle is set forth in

Article 25 of the ILC's Articles, which provides, in pertinent part:

1.  Necessity may not be invoked by a State as a ground for precluding the
    wrongfulness of an act not in conformity with an international obligation of that
    State unless the act:
    (a) Is the only way for the State to safeguard an essential interest against a grave
        and imminent peril; and
    (b) Does not seriously impair an essential interest of the State or States towards
        which the obligation exists, or of the international community as a whole.

2.  In any case, necessity may not be invoked by a State as a ground for precluding
    wrongfulness if:
    (a) The international obligation in question excludes the possibility of invoking
        necessity; or
    (b) The State has contributed to the situation of necessity.

Decision on Liability ¶ 249.

According to Argentina, the Tribunal insufficiently addressed the factors enumerated in

Article 25(1)(a) and (2)(b) for the necessity defense by "summarily conclud[ing] that it was 'not

convinced that the only way Argentina could satisfy that essential interest was by adopting

measures that would subsequently violate the treaty rights of the Claimants' investments to fair

and equitable treatment.'" Pet. ¶ 82 (quoting Decision on Liability ¶ 260).  Argentina bolsters

this position by pointing out that "'a combination of endogenous and exogenous factors

contributed to the Argentine crisis at the beginning of this century.'"  *Id.* (quoting Decision on

Liability ¶ 264).  According to Argentina, the Tribunal's "summary" conclusions exceeded its

authority because those findings "failed to define the applicable legal standards under customary

international law," as required by a decision issued by the ICSID Annulment Committee on *the*

*same day* as the Tribunal's Decision on Liability.  *Id.* ¶ 83 (citing *Enron Creditors Recovery*

*Corp., Ponderosa Assets, L.P. v. The Argentine Republic*, ICSID Case No. ARB/01/3,

Annulment Decision, ¶¶ 368–73 (July 30, 2010)).  Argentina interprets this decision to require

that a single definition of "only way," a phrase used in Article 25(1)(a) "be adopted and

explained," and that "different definitions of 'contributed to,'" a phrase in Article 25(1)(b), "be

analyzed and explained with care before the necessity defense [can] be rejected."  *Id.*

Notwithstanding that the Tribunal's Decision on Liability and the ICSID Annulment

Committee decision were issued contemporaneously, Argentina utterly fails to explain why the

Tribunal should have found this ICSID Annulment Committee decision to be binding or even

persuasive authority in its rejection of the necessity defense.  While international law principles

are binding on the parties in the instant arbitration, Argentina cites no principle of international

law that the rulings by a set of arbitrators in one arbitration are or even should be binding on

another set of arbitrators presiding over different parties to a different dispute.  To the contrary, generally arbitrators have "the power to determine whether a prior award is to be given preclusive effect . . . ."  *SBC Advanced Sols., Inc. v. Commc'ns Workers of Am., Dist. 6*, 794 F.3d 1020, 1028 (8th Cir. 2015) (quoting *Trailways Lines, Inc. v. Trailways, Inc. Joint Counsel*, 807 F.2d 1416, 1425 (8th Cir. 1986)); *see also W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 764–65 (1983) (finding an arbitrator's determination that he was not bound by a prior arbitrator's decision to be binding on the court).

In any event, the Court need not determine whether the Tribunal's interpretation of customary international law should have been informed or somehow bound by the determinations of another panel because the Decision on Liability demonstrates that the Tribunal was "'arguably construing or applying the contract.'"  *Kanuth*, 949 F.2d at 1180–81 (quoting *United Paperworkers*, 484 U.S. at 38).  In this decision, the Tribunal expressly analyzed the UK-BIT and concluded that "principles of international law" applied.  *See* Decision on Liability ¶ 62–63.  The Tribunal next separately addressed each of the four conditions on the application of the defense of necessity in Article 25 of the ILC Articles explaining: "The customary international law, as restated by Article 25 of the ILC Articles, quoted above, imposes additional strict conditions."  *Id.* ¶ 258.  In analyzing each of the four conditions, the Tribunal set forth its reasoning for finding that Argentina failed to satisfy the defense.  *Id.* ¶¶ 260–63 (discussing each of the four conditions).  Although, only discussion of two conditions included express reference to international law sources such as the Commentary to the ILC Articles and decisions by other investment arbitration panels; in none of the discussions did the Tribunal suggest that it was departing from its mandate to apply "applicable principles of international law."  *Id.*

Accordingly, the Tribunal did not "'dispense [its] own brand of industrial justice,'" but rather interpreted and applied the customary international law as was required.  *Garvey*, 532 U.S. at 509 (quoting *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)).  Even if the Tribunal's interpretation or application was in error, that would be insufficient to vacate the award.  *See id.* (finding even serious error to be insufficient to vacate arbitral award); *Oxford Health Plans*, 133 S. Ct. at 2068 ("Only if 'the arbitrator act[s] outside the scope of his contractually delegated authority'—issuing an award that 'simply reflect[s] [his] own notions of [economic] justice' rather than 'draw[ing] its essence from the contract'—may a court overturn his determination." (alterations in original) (quoting *Eastern Associated Coal*, 531 U.S. at 62)).  Similarly, Argentina's contention that "there simply was no interpretation" of customary international law, Pet.'s Opp'n at 36, amounts to a critique of the thoroughness of the Tribunal's analysis, but, even if this were an accurate critique, a lack of extensive analysis is not grounds for vacatur, *Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 481 F.3d 813, 820 (D.C. Cir. 2007) (finding arbitrators are not required to explain the basis for their award when the grounds can be gleaned from the record).  The Tribunal was "arguably construing or applying the contract" when it applied its interpretation of international law and therefore did not exceed its power when rejecting the necessity defense.

### D.  The Arbitral Award Must Be Confirmed

For arbitral awards governed by the New York Convention, a "court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention."  9 U.S.C. § 207.  In this case, Argentina has failed to establish any grounds for vacatur enumerated in Article V(1)(e) of the New York Convention or under FAA §§ 10 and 11.  The two grounds for refusal of recognition or

41

enforcement of the award under the New York Convention identified by Argentina here, namely: (1) Argentina's purported inability to present its case due to the evident partiality of Professor Kaufmann-Kohler, and (2) the Tribunal acting outside the scope of the submission to arbitration, are, as Argentina concedes, "subsumed within the grounds for annulment under § 10(a) of the FAA."  Pet.'s Opp'n at 38 (citing *Scandinavian Reins. Co.*, 668 F.3d at 71).  As Argentina has failed to demonstrate evident partiality and excess of powers under the FAA, its admittedly redundant claims under the New York Convention must also fail.

Still, to obtain confirmation of an award, the New York Convention requires that the applicant shall supply:  "(a) [t]he duly authenticated original award or a duly certified copy thereof;" and "(b) [t]he original agreement referred to in article II or a duly certified copy thereof."  New York Convention, art. IV(1).  AWG has complied with these requirements by submitting to the Court a copy of the award, as authenticated and submitted by the Tribunal, *see* Final Award, and by directing the Court to "Article 8 of the BIT and in AWG's submitting its claim to arbitration," Resp.'s Mem. at 45 (footnote omitted); *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 66–67 (D.D.C. 2013) ("Because the BIT constitutes Ecuador's 'standing offer' to arbitrate, all Chevron must show is that it was a U.S. 'company or national' that submitted an 'investment dispute' in order for the Court to find it had a binding arbitration agreement with Ecuador.").  Accordingly, the arbitral award must be confirmed.

## IV.    CONCLUSION

For the foregoing reasons, Argentina's petition to vacate the arbitral award is denied and AWG's petition to confirm the award is granted.

An appropriate order will accompany this Memorandum Opinion.

Date: September 30, 2016

_____
BERYL A. HOWELL
Chief Judge